ORAL ARGUMENT NOT YET SCHEDULED

Nos. 25-1282, 25-1283, 25-1034, 25-1035 (Consolidated)

# In the United States Court of Appeals for the D.C. Circuit

PALM BEACH COUNTY, a political division of the State of Florida,
TOWN OF PALM BEACH, a municipal corporation of the State of Florida, and
CITY OF WEST PALM BEACH, a municipal corporation of the State of Florida,

*Petitioners,*

*v.*

FEDERAL AVIATION ADMINISTRATION,

*Respondent.*

On Petitions for Review of Orders of the
Federal Aviation Administration

**JOINT PETITIONERS' BRIEF**


Steven L. Osit
sosit@kaplankirsch.com
Samantha R. Caravello
scaravello@kaplankirsch.com
Rebecca Glenn
rglenn@kaplankirsch.com
Kaplan Kirsch LLP
1675 Broadway, Suite 2300
Denver, Colorado 80202
303.825.7000

*Counsel for Palm Beach County*

Jeffrey L. Oldham
joldham@jw.com
Jackson Walker LLP
100 Congress Ave.,
Suite 1100
Austin, Texas 78701
512.236.2000

Justin V. Lee
jlee@jw.com
Cody A. Martinez
cmartinez@jw.com
Jackson Walker LLP
2323 Ross Ave.,
Suite 600
Dallas, Texas 75201
214.953.6000

*Counsel for Town of Palm Beach, Florida and City of West Palm Beach, Florida*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**Parties and Amici**. Petitioner in Case Nos. 25-1282 and 25-1034 is Palm Beach County, Florida (the "County"). Petitioners in Case Nos. 25-1283 and 25-1035 are the Town of Palm Beach, Florida (the "Town"), and the City of West Palm Beach, Florida (the "City"). Respondent is the Federal Aviation Administration ("FAA").

**Rulings under Review**. These Petitions for Review concern twenty-four orders (collectively, the "Orders") issued by the FAA that collectively prohibit aircraft from overflying the Mar-a-Lago Club owned by the President and route all aircraft arriving at and departing from the Palm Beach International Airport* (the "Airport") away from Mar-a-Lago and over other areas. The Orders under review are:

1. Notice to Airmen No. FDC 5/2809 (issued Oct. 18, 2025), Administrative Record ("AR") 00333;

2. Palm Beach Airport Traffic Control Tower, Letter to Airmen LTA-PBI-12, AR00637;

---

* Pursuant to Chapter 2026-15, Laws of Florida 2026, the Airport will soon be renamed the "President Donald J. Trump International Airport."

3. Palm Beach Airport Traffic Control Tower, Letter to Airmen LTA-PBI-13, AR00532;

4. Standard Instrument Approach Procedures, and Takeoff Minimums and Obstacle Departure Procedures; Miscellaneous Amendments, 90 Fed. Reg. 57,353 (Dec. 11, 2025), as it pertains to the procedures at West Palm Beach, FL, PBI, AR00533-34;

5. Departure Procedure AHABB ONE (OBSTACLE) (RNAV), effective January 22, 2026, AR00783;

6. Departure Procedure MIXAE FOUR (RNAV), effective January 22, 2026, AR00926;

7. Departure Procedure OLAKE THREE (RNAV), effective January 22, 2026, AR01047-48;

8. Departure Procedure PALM BEACH FOUR, effective January 22, 2026, AR01126;

9. Departure Procedure SLIDZ THREE (RNAV), effective January 22, 2026, AR01268-69;

10. Departure Procedure TBIRD SEVEN (RNAV), effective January 22, 2026, AR01695-97;

11. Departure Procedure WELLY FOUR (RNAV), effective January 22, 2026, AR01796;

12. Instrument Approach Procedure ILS OR LOC RWY 10L, effective January 22, 2026, AR01902;

13. Instrument Approach Procedure ILS OR LOC RWY 28R, effective January 22, 2026, AR01984;

14. Instrument Approach Procedure RNAV (RNP) W RWY 28R, effective January 22, 2026, AR01990;

15. Instrument Approach Procedure RNAV (RNP) Z RWY 10L, effective January 22, 2026, AR01986;

16. Instrument Approach Procedure RNAV (RNP) Z RWY 14, effective January 22, 2026, AR01982;

17. Instrument Approach Procedure RNAV (RNP) Z RWY 28R, effective January 22, 2026, AR01983;

18. Instrument Approach Procedure RNAV (RNP) Z RWY 32, effective January 22, 2026, AR01987;

19. Instrument Approach Procedure RNAV (GPS) X RWY 28R, effective January 22, 2026, AR01989;

20. Instrument Approach Procedure RNAV (GPS) Y RWY 10L, effective January 22, 2026, AR01903;

21. Instrument Approach Procedure RNAV (GPS) Y RWY 14, effective January 22, 2026, AR01988;

22. Instrument Approach Procedure RNAV (GPS) Y RWY 28R, effective January 22, 2026, AR01985;

23. Instrument Approach Procedure RNAV (GPS) Y RWY 32, effective January 22, 2026, AR01981; and

24. IFR Takeoff Minimums, (Obstacle) Departure Procedures, and Diverse Vector Area (Radar Vectors), AR01973-80, as it pertains to the procedures at the Airport.

**Related Cases**. The Court consolidated the above-captioned cases through its orders dated December 15, 2025, February 17, 2026, and February 18, 2026. To counsel's knowledge, there are no other cases pending before the FAA, this Court, or any other court that involve substantially the same issues.

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ........ i

TABLE OF CONTENTS ........ v

TABLE OF AUTHORITIES ........ viii

GLOSSARY ........ xiii

JURISDICTIONAL STATEMENT ........ 1

STATEMENT OF ISSUES ........ 1

STATEMENT REGARDING ADDENDUM OF STATUTES AND REGULATIONS ........ 2

STATEMENT OF THE CASE ........ 3

A. The FAA previously established TFRs only when the President was visiting Mar-a-Lago. ........ 4

B. The Secret Service requests permanent, 24/7/365 flight restrictions over Mar-a-Lago. ........ 5

C. The FAA acknowledges that the requested flight restrictions would significantly impact the Airport's operations and require noise and environmental studies. ........ 6

D. The FAA develops a plan to fast-track the implementation of permanent flight restrictions over Mar-a-Lago. ........ 8

E. The FAA designates airspace over Mar-a-Lago as "national defense airspace" and modifies Airport procedures ........ 8

F. The FAA's unannounced action causes public uproar over aircraft noise and its effects on the community ........ 10

G. The FAA hurriedly redesigns the Airport's approach and departure procedures to avoid the National Defense Airspace through belated and inadequate environmental review. ..... 14

SUMMARY OF THE ARGUMENT ..... 18

STANDING ..... 20

A. The Orders have injured the County. ..... 20

B. The Orders have injured the City and the Town. ..... 25

C. Petitioners' injuries were caused by the Orders and are redressable by the Court. ..... 28

ARGUMENT ..... 29

I. THE FAA'S ESTABLISHMENT OF THE NATIONAL DEFENSE AIRSPACE OVER MAR-A-LAGO VIOLATES THE APA AND APPLICABLE ENVIRONMENTAL REVIEW STATUTES ..... 29

A. The FAA failed to follow mandatory notice-and-comment procedures. ..... 29

B. The National Defense Airspace is inconsistent with statutory criteria and not the product of reasoned decisionmaking. ..... 32

C. The FAA failed to conduct any environmental review. ..... 39

II. THE FAA'S MODIFICATION OF THE AIRPORT'S DEPARTURE AND ARRIVAL PROCEDURES SOLELY TO AVOID OVERFLIGHT OF MAR-A-LAGO VIOLATES THE APA AND APPLICABLE ENVIRONMENTAL REVIEW STATUTES ..... 45

A. There is no "reasoned basis" for the Redesigned Procedures. ..... 45

B. The FAA arbitrarily and capriciously applied a categorical exclusion to avoid more detailed NEPA review of the Redesigned Procedures. .................................... 46

C. The FAA failed to consider the impact of the Redesigned Procedures on historic properties under the NHPA. ......................................................................... 56

D. The FAA failed to comply with Section 4(f) and failed to consider the impact of the Redesigned Procedures on park and recreation areas. ................................................ 65

III. VACATUR IS THE APPROPRIATE REMEDY ............................ 71

CONCLUSION ......................................................................... 74

CERTIFICATE OF COMPLIANCE ....................................................... 76

## TABLE OF AUTHORITIES


Cases **Page**

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
988 F.2d 146 (D.C. Cir. 1993)........................................................71

*Allina Health Servs. v. Sebelius*,
746 F.3d 1102 (D.C. Cir. 2014)........................................................71

*Allison v. Dep't of Transp.*,
908 F.2d 1024 (D.C. Cir. 1990)........................................................26

*AMB Onsite Servs.-West, Inc. v. NLRB*,
849 F.3d 1137 (D.C. Cir. 2017)........................................................36

*Am. Bird Conservancy, Inc. v. FCC*,
516 F.3d 1027 (D.C. Cir. 2008)........................................................53

*Am. Great Lakes Ports Ass'n v. Schultz*,
962 F.3d 510 (D.C. Cir. 2020)........................................................71

*Backcountry Against Dumps v. FAA*,
77 F.4th 1260 (9th Cir. 2023)........................................................32

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*,
462 U.S. 87 (1983)........................................................39

*BFI Waste Sys. of N. Am., Inc. v. FAA*,
293 F.3d 527 (D.C. Cir. 2002)........................................................31

*Ctr. for Biological Diversity v. Salazar*,
706 F.3d 1085 (9th Cir. 2013)........................................................42

*Ctr. for Biological Diversity v. Zeldin*,
171 F.4th 356 (D.C. Cir. 2026)........................................................26

*Cincinnati Bell Tel. Co. v. FCC*,
69 F.3d 752 (6th Cir. 1995)........................................................38

*Citizens Against Rails-to-Trails v. Surface Transp. Bd.*,
267 F.3d 1144 (D.C. Cir. 2001) .......... 40

*City of Alexandria v. Slater*,
198 F.3d 862 (D.C. Cir. 1999) .......... 66

*City of Anaheim, Cal. v. FERC*,
558 F.3d 521 (D.C. Cir. 2009) .......... 32

*City of Billings v. Transp. Sec. Admin.*,
153 F.4th 46 (D.C. Cir. 2025) .......... 30

*City of Dania Beach v. FAA*,
485 F.3d 1181 (D.C. Cir. 2007) .......... 20, 24, 25, 26

*City of Grapevine v. Dep't of Transp.*,
17 F.3d 1502 (D.C. Cir. 1994) .......... 66

*City of Las Vegas v. FAA*,
570 F.3d 1109 (9th Cir. 2009) .......... 23, 27

*City of Los Angeles v. Dickson*,
No. 19-71581, 2021 WL 2850586 (9th Cir. July 8, 2021) .......... 60, 69

*City of Olmsted Falls v. FAA*,
292 F.3d 261 (D.C. Cir. 2002) .......... 20

*City of Phoenix v. Huerta*,
869 F.3d 963 (D.C. Cir. 2017) .......... 39, 46, 53, 54, 60, 68

*City of Sausalito v. O'Neill*,
386 F.3d 1186, 1197 (9th Cir. 2004) .......... 24

*City of Waukesha v. EPA*,
320 F.3d 228 (D.C. Cir. 2003) .......... 25

*Clark Cnty. v. FAA*,
522 F.3d 437 (D.C. Cir. 2008) .......... 65

*Clean Wis. v. EPA*,
964 F.3d 1145 (D.C. Cir. 2020).......................................................................20

*Cnty. of Rockland v. FAA*,
335 F. App'x 52 (D.C. Cir. 2009) ....................................................................66

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) ..........................................................................................33

*Dep't of Transp. v. Public Citizen*,
541 U.S. 752 (2004) .......................................................................................42

*D.C. Fed'n of Civic Ass'ns v. Volpe*,
459 F.2d 1231 (D.C. Cir. 1971).......................................................................66

*Eagle Cnty. v. Surface Transp. Bd.*,
82 F.4th 1152 (D.C. Cir. 2023) .......................................................................57

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) .................................................................................30, 35

*Env't Def. Fund v. FERC*,
2 F.4th 953 (D.C. Cir. 2021) ...........................................................................73

*Jud. Watch, Inc. v. U.S. Dep't of Homeland Sec.*,
895 F.3d 770 (D.C. Cir. 2018).........................................................................33

*Marin Audubon Soc'y v. FAA*,
121 F.4th 902 (D.C. Cir. 2024) ...............................................................55, 56

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ..........................................................................33, 35, 36

*Narragansett Indian Tribe v. McMaster*,
No. 24-5193, 2026 WL 1450020 (D.C. Cir. May 22, 2026)......................26

*Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*,
752 F.3d 999 (D.C. Cir. 2014).........................................................................31

*Nat'l Trust for Historic Pres. in the U.S. v. Nat'l Park Serv.*,
Civil Case No. 25-3116 (D.D.C. Apr. 16, 2026) .......................................35

*New Jersey v. EPA*, 989 F.3d 1038 (D.C. Cir. 2021) ...............................20

*N.J. Conservation Found. v. FERC*,
111 F.4th 42 (D.C. Cir. 2024) ..................................................................72

*North Carolina v. FAA*,
957 F.2d 1125 (4th Cir. 1992) .................................................................30

*Ohio v. EPA*,
603 U.S. 279 (2024) ..................................................................................39

*Penn Cent. Transp. Co. v. City of New York*,
438 U.S. 104 (1978) ..................................................................................56

*Pueblo of Sandia v. United States*,
50 F.3d 856 (10th Cir. 1995) ....................................................................58

*Spirit Airlines, Inc. v. U.S. Dep't of Transp.*,
997 F.3d 1247 (D.C. Cir. 2021)................................................................45

*Solondz v. FAA*,
141 F.4th 268 (D.C. Cir. 2025) ................................................................34

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
985 F.3d 1032 (D.C. Cir. 2021)................................................................72

*Vill. of Bensenville v. FAA*,
376 F.3d 1114 (D.C. Cir. 2004)................................................................33

*Wilderness Watch v. Mainella*,
375 F.3d 1085 (11th Cir. 2004) ...............................................................49

Statutes

5 U.S.C. § 553 ..........................................................................................29

42 U.S.C. § 4336e .....................................................................................40

49 U.S.C. § 303 ........ 44, 66

49 U.S.C. § 40103 ........ 29, 32, 33, 34, 36, 41

49 U.S.C. § 46110 ........ 1

54 U.S.C. § 306108 ........ 44, 56

<u>Regulations</u>

14 C.F.R. § 91.141 ........ 4

23 C.F.R. § 774.3 ........ 67, 70

36 C.F.R. § 800.2 ........ 57, 60

36 C.F.R. § 800.3 ........ 58, 59

36 C.F.R. § 800.4 ........ 56, 58, 59, 61, 62

36 C.F.R. § 800.5 ........ 56, 58, 61

36 C.F.R. § 800.6 ........ 56

36 C.F.R. § 800.16 ........ 61

Establishment of Prohibited Area P-75; New York, NY,
91 Fed. Reg. 23,187 (Apr. 30, 2026) ........ 6, 31

## GLOSSARY

| | |
|---|---|
| Airport | Palm Beach International Airport (PBI), soon to be renamed the President Donald J. Trump International Airport (DJT) |
| APA | Administrative Procedure Act |
| City | Petitioner City of West Palm Beach |
| County | Petitioner Palm Beach County |
| FAA | Federal Aviation Administration |
| LTA | Letter to Airmen |
| NEPA | National Environmental Policy Act |
| NHPA | National Historic Preservation Act |
| NOTAM | Notice to Airmen |
| National Defense Airspace | The “national defense airspace” designated by the FAA through Notice to Airmen No. FDC 5/2809 (issued Oct. 18, 2025) |
| Redesigned Procedures | Those arrival and departure procedures promulgated by the FAA on January 22, 2026, which permanently route aircraft away from Mar-a-Lago |
| SHPO | State Historic Preservation Officer |
| TFR | Temporary Flight Restriction |
| Town | Petitioner Town of Palm Beach |

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over the Petitions for Review under 49 U.S.C. § 46110(a). Each of the challenged orders is a "final order" within the meaning of Section 46110(a). Petitioners filed their first Petitions for Review on December 12, 2025, which is within the 60-day period prescribed by Section 46110(a) for the Notice to Airmen issued October 18, 2025; the Letters to Airmen dated October 15, 2025 and December 10, 2025; and the December 11, 2025 Federal Register Notice.

Petitioners filed their second Petitions for Review on February 12, 2026 and February 13, 2026, which is within the 60-day period prescribed by Section 46110(a) for the Departure Procedures and Instrument Approach Procedures issued by the FAA on January 22, 2026.

## STATEMENT OF ISSUES

1. Whether the FAA's establishment of the National Defense Airspace over the Mar-a-Lago Club owned by the President, at the request of the Secret Service, was arbitrary and capricious or otherwise not in accordance with law where the FAA did not comply with notice-and-comment procedures or articulate a reasoned explanation for

excluding all aircraft at all times, knowingly disregarded its obligations under the National Environmental Policy Act ("NEPA"), the National Historic Preservation Act ("NHPA"), and Section 4(f) of the Department of Transportation Act, and otherwise erred.

2. Whether the FAA's promulgation of the Redesigned Procedures at the Airport was arbitrary and capricious or otherwise not in accordance with law where the only reason to modify long-standing flight paths was to avoid the unlawfully established National Defense Airspace, and the FAA improperly applied a categorical exclusion to avoid more detailed environmental review required by NEPA, failed to engage in local consultations required under the NHPA and Section 4(f), and otherwise erred.

## STATEMENT REGARDING ADDENDUM OF STATUTES AND REGULATIONS

Pursuant to Circuit Rule 28(a)(5), pertinent statutes, regulations, and agency orders are set forth in a separate addendum to this brief.

## STATEMENT OF THE CASE

These consolidated Petitions for Review challenge two sets of orders (collectively, the "Orders") issued by the FAA that altered long-standing flight procedures at the Airport. The first established the National Defense Airspace over Mar-a-Lago, prohibiting all flights at all times, and established ad hoc procedures to route aircraft away from Mar-a-Lago.[1] The second implemented redesigned arrival and departure procedures at the Airport to permanently reroute aircraft away from Mar-a-Lago and over residential communities and other noise-sensitive areas that were previously only occasionally exposed to aircraft noise.[2]

---

[1] The National Defense Airspace was established through Notice to Airmen No. FDC 5/2809. AR0033. The FAA established ad hoc procedures through the Letters to Airmen LTA-PBI-12, AR00637, and LTA-PBI-13, AR00532.

[2] The redesigned arrival and departure procedures, collectively referred to as the "Redesigned Procedures," are AHABB ONE, AR00783; MIXAE FOUR, AR00926; OLAKE THREE, AR01047-48; PALM BEACH FOUR, AR01126; SLIDZ THREE, AR01268-69; TBIRD SEVEN, AR01695-97; WELLY FOUR, AR01796; ILS OR LOC RWY 10L, AR01902; ILS OR LOC RWY 28R, AR01984; RNAV (RNP) W RWY 28R, AR01990; RNAV (RNP) Z RWY 10L, AR01986; RNAV (RNP) Z RWY 14, AR01982; RNAV (RNP) Z RWY 28R, AR01983; RNAV (RNP) Z RWY 32, AR01987; RNAV (GPS) X RWY 28R, AR01989; RNAV (GPS) Y RWY 10L, AR01903; RNAV

A. The FAA previously established TFRs only when the President was visiting Mar-a-Lago.

The FAA routinely establishes Temporary Flight Restrictions ("TFRs") over locations visited by the President. 14 C.F.R. § 91.141.

During President Trump's first term, and until October 20, 2025, the FAA only imposed a TFR around Mar-a-Lago when the President was there.[3] AR00057. Because Mar-a-Lago is only 2.1 nautical miles east of the Airport and almost directly in line with the Airport's primary runway, AR00135, such TFRs were designed to preserve the Airport's operational efficiency. Aircraft operations were generally prohibited within ten nautical miles of Mar-a-Lago, but commercial airlines were exempt because they operate in strict accordance with the Transportation Security Administration's security programs. AR00015. Other aircraft (often referred to as "general aviation" aircraft) could be

---

(GPS) Y RWY 14, AR01988; RNAV (GPS) Y RWY 28R, AR01985; RNAV (GPS) Y RWY 32, AR01981; and IFR Takeoff Minimums, (Obstacle) Departure Procedures, and Diverse Vector Area (Radar Vectors), AR01973-80, as it pertains to the procedures at the Airport.

[3] When the President was not at Mar-a-Lago, the FAA only prohibited overflights by unmanned aircraft systems, *i.e.*, drones. AR00057.

screened by the Transportation Security Administration prior to departure from the Airport, or first land at one of several designated "gateway" airports for pre-screening before continuing to the Airport. AR00016. The FAA assigned headings to all departing aircraft so as to avoid routing aircraft within one nautical mile of Mar-a-Lago as much as possible, but otherwise coordinated with the Secret Service when the FAA determined it was necessary to overfly Mar-a-Lago. AR00050-53.

Petitioners do not challenge those TFRs, which remain in effect when the President visits Mar-a-Lago.

### B. The Secret Service requests permanent, 24/7/365 flight restrictions over Mar-a-Lago.

On September 10, 2025, the Secret Service requested that the FAA establish a "permanent fixed flight restriction area[]" extending one nautical mile around Mar-a-Lago, from the surface to 1,000 feet above ground level.[4] AR00649. The requested "24/7/365" restriction, which

---

[4] This initial request was unsigned. AR00649. The Secret Service sent an identical signed letter six days later. AR00178. Notably, the same letter requested a similar restriction over the President's New York City

would apply to all aircraft and "remain active irrespective of the President's presence at Mar-a-Lago," was a marked deviation from the FAA's past practice for presidential security. AR00230, 00345.

To justify its request, the Secret Service cited "adverse threat intelligence," its "ongoing protective mission," and the "ability to mitigate the persistent risks posed by unauthorized aircraft and unmanned aircraft systems," AR00649, but provided no specifics. The Secret Service offered to "provide additional operational justification [and] coordinate on technical details," *id.*, but there is no record evidence that the FAA sought, or the Secret Service provided, additional information. *Id.*

C. The FAA acknowledges that the requested flight restrictions would significantly impact the Airport's operations and require noise and environmental studies.

Upon receiving the Secret Service's letter, the FAA began assessing the "operational impacts" of the requested restrictions on the Airport. *E.g.*, AR00180-83, 00547-52. FAA staff quickly noted the requested

---

residence. *Id.* The FAA has initiated a formal rulemaking to establish that restriction. *See* 91 Fed. Reg. 23,187 (Apr. 30, 2026).

restriction would "severely limit commercial operations at PBI"; "creat[e] severe safety, capacity, and efficiency impacts that cannot be mitigated in the near term"; require two-thirds of the Airport's air traffic to utilize alternate runways; "significantly impact general aviation operations"; and "require redesign" of flight procedures, including "[n]ew procedures with immediate turns" and non-standard climb gradients. AR00180-83.

Additionally, the FAA immediately recognized that the requisite changes to flight procedures would alter flight paths and increase aircraft noise in surrounding areas. AR00470 ("Noise/Environmental studies would likely need to occur if we procedurally change these flight paths to avoid overflight of Mar-A-Lago."); *see also* AR00183 (identifying "noise," "community impact," and "airspace congestion risks").

In an effort to avoid these impacts, the FAA's Chief Operating Officer recommended that the Administrator either "adopt a commercial traffic exemption" to any restriction over Mar-a-Lago or significantly reduce the restriction's physical dimensions. AR00180-83.

D. The FAA develops a plan to fast-track the implementation of permanent flight restrictions over Mar-a-Lago.

The Chief Operating Officer's recommendations were apparently disregarded. On October 10, 2025, the FAA formally responded to the Secret Service's request. AR00224-28. The FAA indicated it would promptly establish a no-fly zone (one nautical mile in radius and up to 2,000 feet above ground level)[5] over Mar-a-Lago, and issue headings to keep aircraft away from Mar-a-Lago until formal arrival and departure procedures could be developed. AR00224, 00608.

E. The FAA designates airspace over Mar-a-Lago as "national defense airspace" and modifies Airport procedures.

On October 18, 2025, the FAA implemented phase one of its plan by issuing Notice to Airmen ("NOTAM") No. FDC 5/2809, through which it classified the airspace within one nautical mile of Mar-a-Lago up to 2,000 feet as "national defense airspace" (the "National Defense Airspace") and restricted all flight operations therein, effective October 20, 2025. *See* AR00326-29. The FAA also supplanted the Airport's

---

[5] The Administrative Record does not indicate why this altitude was increased to 2,000 feet when the Secret Service requested only 1,000 feet.

established arrival and departure procedures by issuing Letter to Airmen LTA-PBI-12, requiring arriving and departing aircraft to maintain headings that avoided the National Defense Airspace.[6] *See* AR00637. These new headings vectored all aircraft around the National Defense Airspace, as depicted below:




AR00647. Despite the FAA's earlier acknowledgement that such changes would require environmental review and internal safety waivers "with

---

[6] LTA-PBI-12 initially prohibited all departures from Runway 10R, the Airport's shorter runway used primarily by general aviation aircraft. AR00637. The FAA later removed that restriction through the issuance of LTA-PBI-13. See AR00751-52.

no guarantee of approval," AR00181-83, the FAA did not conduct any environmental review or document any internal safety waivers prior to establishing the National Defense Airspace or amending the Airport's approach and departure procedures through the LTA.

F. <u>The FAA's unannounced action causes public uproar over aircraft noise and its effects on the community.</u>

Overnight, the flight paths over the Town and City changed drastically. For years, the Airport's departure procedures had required aircraft departing on Runway 10L to fly straight out to the ocean before turning on course, as depicted below:



AR00477 (departures in blue; arrivals in red). The County had invested considerable resources to manage noise impacts along these corridors, including purchasing and insulating homes. Beebe Decl. ¶ 22.

The FAA's changes, however, diverted and noticeably concentrated flights to the northeast of the Airport:




AR00478.

Less than one month after the flight restrictions went into effect, the FAA noted their "impact[] to airport operations" and "airport development plans," and—specifically—how they "change[d] . . . the noise footprint experienced by local residents." AR00345. In particular, the agency stated the LTA procedures, as well as the "upcoming changes to

instrument flight procedures," "route[d] and concentrate[d] air traffic over noise sensitive areas that previously experienced this level of noise only occasionally." AR00346; *see also* 00531 (changes "will shift noise to new communities permanently"). Because the FAA implemented these changes without *any* engagement with the County or surrounding communities, *see* AR00531 (noting no stakeholder engagement), the public outcry was severe and immediate.

Just four days after the changes went into effect, the Town's mayor issued a formal complaint to the FAA outlining the "significant and measurable" disruption to her community due to "[e]xcessive" noise caused by the creation of "new flight paths directly over residential neighborhoods," and resultant adverse effects on "quality of life, public health, and property values." AR00342.

The City's mayor also decried the adverse effects on "community livability and economic vitality," including the "potential structural vibrations" that its historic properties were experiencing from the now-routine low-altitude overflights. Exhibit 1. The County and United

States congressional representatives also lodged complaints with the FAA regarding the changes. AR00347, 00717-21, 00735.

The confusion and concern expressed by elected representatives mirrored the sentiments of their constituents, who were outraged by the FAA's unannounced actions. Noise complaints spiked dramatically, and the County's "community noise outreach meetings" became more heavily attended "than anytime [sic] in their history." AR00711.

At the November 6, 2025 meeting of the Citizens Committee on Airport Noise, residents reported: being disturbed by aircraft noise as early as 6:00 a.m. and as late as 11:00 p.m.; an inability to converse outside due to aircraft noise; soot covering their properties; the smell of jet fuel permeating their homes; potential damage to the architectural features of historic homes; and concern over the long-term health impacts attributable to noise and air pollution caused by the overflights. PBCTV, *Citizens Committee on Airport Noise, YouTube*, 33:45, 46:11, 1:03:53 (Nov. 6, 2025), https://www.youtube.com/live/onTKIGTE57Y.

### G. The FAA hurriedly redesigns the Airport's approach and departure procedures to avoid the National Defense Airspace through belated and inadequate environmental review.

At the same time, the FAA hurriedly began developing the Redesigned Procedures to permanently route aircraft away from the National Defense Airspace. This was no small undertaking. The flight restrictions "impact[ed] approximately 17 instrument flight procedures" at the Airport, and required what the FAA described as a complete "redesign" of the Airport's airspace. *E.g.*, AR00346, 00338, 00541-43, 00582, 00608, 00654, 00672, 00744. In fact, the FAA not only redesigned six departure and twelve approach procedures, it established one *new* departure procedure and five "diverse vector areas." *Supra* at 3 n.2. This effort was further complicated by the FAA's desire to expedite the development of the Redesigned Procedures. *E.g.*, AR00590, 00605, 00669 (describing "short notice" to implement the new procedures, being "under a tight timeline," and a need for "urgency").

At first, the FAA sought to avoid *any* environmental review of the Redesigned Procedures, due to its purported "lack of . . . decision making authority in implementing the[] changes" and its alleged lack of

"substantial control or responsibility."[7] AR00347, 01991. The FAA continued equivocating over NEPA's applicability until late November 2025. *See* AR00525 (noting that "NEPA action may/may not be required"), 00724 (noting that FAA staff had not "gotten a firm answer one way or the other" regarding NEPA). By December 2025, the FAA internally admitted that the Redesigned Procedures "would breach the accepted noise significance threshold" and that "significant noise is unavoidable . . . ." AR00741. Thus, the FAA sought to "come up with a sound explanation in the NEPA review that [would] help quash any noise complaints, legitimate tho [sic] they may be." *Id.*

*First*, the FAA commissioned the MITRE Corporation to conduct a noise study to ascertain whether the Redesigned Procedures would cause a "significant" increase in noise. *See* AR00754-55, 00756-57. The FAA received the final study on January 20, 2026—*two days* before the

---

[7] Fearing that the FAA intended to forego appropriate environmental review of the Redesigned Procedures, the County submitted a letter urging the agency to consider the impacts of the Redesigned Procedures. AR00717-21, 00746. The FAA ignored the County's comments, directing it to the Secret Service for "more information." *E.g.,* Exhibit 2.

agency's planned publication of the Redesigned Procedures. AR02054, *see* 02028-47. That study purported to compare "baseline" aircraft noise levels with the noise levels that would be generated by the Redesigned Procedures (as modeled by MITRE). But despite claiming to have calculated the baseline from sixty randomly selected days "between September 2024 and August 2025," when no flight restrictions were in place, MITRE included data from a day when flight restrictions *were* in place. AR02034-35. Based on that analysis, the report concluded that large swaths of the City and Town would be exposed to "reportable" noise increases, but none rose to "significant" levels. AR02032, 02042-43.

*Second*, on January 15, 2026, one week before the publication of the Redesigned Procedures, the FAA sent a letter to Florida's deputy State Historic Preservation Officer ("SHPO"), purportedly to "initiate consultation under Section 106 of the NHPA."[8] AR02049-52, 02057. That letter made clear, however, that the FAA had already concluded that the

[8] The FAA sent the letter to the deputy SHPO because the acting SHPO was on personal leave. *See* AR02057-58.

Redesigned Procedures would have "No Adverse Effect" on historic properties and requested that the SHPO summarily approve that decision after the fact and on an "expedited" basis. *See* AR02049-52, 02057. On January 21, 2026, just six days later, the deputy SHPO sent a letter concurring with the FAA's conclusion. AR02053.

*Finally*, on the same day the FAA received the deputy SHPO's response, the agency finalized a "Categorical Exclusion Document" concluding that its actions were categorically excluded from further environmental review under NEPA. AR01999-2053. Although the Redesigned Procedures would permanently route aircraft over noise-sensitive areas that had only "occasionally" been exposed to overflights, AR00346, 00531, the FAA relied on a categorical exclusion that applies to "procedures conducted below 3,000 feet AGL that do *not* cause traffic to be routinely routed over noise-sensitive areas" or mere "modifications to currently approved procedures conducted below 3,000 ft. [above ground level] that do not significantly increase noise over noise-sensitive areas." AR02000 (emphasis added). The FAA published the Redesigned Procedures the following day, and they went into effect immediately.

## SUMMARY OF THE ARGUMENT

Petitioners recognize that the President's security is paramount, even where it requires that Petitioners and their residents bear substantial burdens. But the APA demands that the FAA engage in "reasoned decisionmaking" and comply with federal law, even in the discharge of this solemn responsibility. The FAA failed to observe these fundamental dictates in establishing the National Defense Airspace and the Redesigned Procedures in several respects.

The FAA violated the APA in establishing the National Defense Airspace because the FAA did not follow required notice-and-comment procedures, engage in reasoned decisionmaking, or make any effort to comply with NEPA. The National Defense Airspace was established through a "Notice to Airmen," which did not afford any opportunity for public comment or establish good cause for dispensing with those procedures. The FAA also failed to explain why the National Defense Airspace was necessary for the President's security when he is not at Mar-a-Lago, or why less burdensome alternatives expressly suggested by the FAA's own senior leadership were infeasible. And because the FAA

improperly concluded that the National Defense Airspace was exempt from NEPA, it conducted no environmental analysis at all.

The Redesigned Procedures also violate the APA. First, they are explained only by the need to avoid the National Defense Airspace, which was itself promulgated unlawfully. Second, the FAA did not comply with NEPA, the NHPA, or Section 4(f) of the Department of Transportation Act in promulgating the Redesigned Procedures. The FAA improperly invoked a categorical exclusion designed for mere modifications of procedures that do not routinely route aircraft over new noise-sensitive areas, which is not true for the Redesigned Procedures. Moreover, the FAA ignored clearly present "extraordinary circumstances" that precluded its use of a categorical exclusion and based its decision on a flawed noise analysis that understated the increase in noise resulting from the Redesigned Procedures. The FAA also failed to engage in required consultation or consider the adverse impact of the Redesigned Procedures with respect to historic resources subject to the NHPA or parks and recreation areas subject to Section 4(f).

The Court should grant the Petitions for Review and vacate the National Defense Airspace and the Redesigned Procedures.

## STANDING

To establish standing, Petitioners must demonstrate "a concrete and particularized injury that is actual or imminent, caused by or fairly traceable to the act being challenged in the litigation, and redressable by the court." *City of Dania Beach v. FAA*, 485 F.3d 1181, 1185 (D.C. Cir. 2007) (citation modified). Petitioners satisfy this requirement.

A. The Orders have injured the County.

The Orders directly regulate how the Airport's runways may be utilized by arriving and departing aircraft. As the owner and operator of the Airport, the County's standing is thus self-evident. *See New Jersey v. EPA*, 989 F.3d 1038, 1045 (D.C. Cir. 2021).

Moreover, the Orders have resulted in direct harm to the County's economic and administrative interests. *Clean Wis. v. EPA*, 964 F.3d 1145, 1158 (D.C. Cir. 2020); *City of Olmsted Falls v. FAA*, 292 F.3d 261, 268 (D.C. Cir. 2002) (local government standing based on "alleged harm to its own economic interests").

*First*, the FAA internally warned that the Orders would constrain the Airport's operations and capacity by limiting the use of the primary runway. AR00181-83, AR00531. Those concerns have materialized. The Orders effectively shorten the usable length of the Airport's runways, thereby limiting the Airport's ability to accommodate certain aircraft. Beebe Decl. ¶¶ 29-30; AR00711 (restrictions create a "shortened airspace to the [northeast], so we cannot accommodate as many aircraft . . . as we used to"). Indeed, the FAA's Air Traffic Manager has made clear that the Orders "reduce[] our capacity and efficiency for flowing traffic." AR00711; *see also* AR00346 (implementing restrictions "reduced the peak airport arrival rate from 28 to 24 arrivals per hour").

The FAA also cautioned the Redesigned Procedures would "definitely add additional risk." AR00545. And they have. AR00711 (restrictions "have caused an increase in go-arounds due to unstable approaches"); AR00767 ("unstable approaches and go-arounds are much more common" due to restrictions). Pilot's Aviation Safety Reporting

System[9] reports reinforce these worries. *See* Exhibit 3 (noting the Orders require an "extremely uncomfortable series of maneuvers" that are "questionable from a stabilized approach perspective" and, if there is limited ceiling or visibility, they "would certainly not allow for a safe operation"); Exhibit 4 (reporting "dangerous" difficulty spotting inbound aircraft when departing and explaining that the Redesigned Procedures were "a major contributing factor").

These operational challenges raise the risk of revenue loss from diverted flights. At least one such diversion has already occurred. In March, the Redesigned Procedures caused a flight bound for the Airport to be diverted to another airport. Beebe Decl. ¶¶ 23-24. Moreover, the Orders' impact on operations could compound revenue loss if travelers or airlines choose to use other airports in the area instead. *Id.* ¶¶ 25-26; AR00531 (FAA listing "loss of airline revenue" as impact).

*Second,* the Orders hinder the County's expansion plans for the Airport. The County has long planned to enhance capacity by expanding

---

[9] Available at https://asrs.arc.nasa.gov/search/database.html.

Runway 10R-28L (which runs parallel to Runway 10L-28R) and expended time and money on this project. Beebe Decl. ¶¶ 31-32. By severely limiting airspace capacity east of the Airport, the Orders have complicated those plans and will require the County to undertake additional planning (and incur associated costs). *Id.* ¶¶ 33-34; *see also* AR00346 (the Orders "will impact the [County's] plans to extend existing RWY 10R/28L as the efficiency gains would be less than previously anticipated."). In fact, the FAA apparently intends to "[i]nitiate the process to extend Runway 14/32"—a different runway entirely—"and reduce reliance on Runway 10L for commercial operations." AR00225. Expansion of Runway 14/32 would not only increase the County's costs, but would do little to address its capacity challenges. Beebe Decl. ¶ 35.

*Third*, the substantial increase in overflights experienced by nearby communities as a result of the Orders harms the County's proprietary interests in managing the noise impacts of the Airport. *City of Las Vegas v. FAA*, 570 F.3d 1109, 1114 (9th Cir. 2009) (holding that city had standing because "proposed departure path directs flights over densely populated parts of the city, which threatens the city's interests in the

environment and in land management"); *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir. 2004) (injuries to municipality's "own proprietary interests," including the "municipality's responsibilities, powers, and assets" confer standing (citation modified)). Noise complaints spiked as soon as the Orders went into effect. Beebe Decl. ¶ 14. The County has been forced to devote substantial time and resources to investigate and respond to these complaints and additional time to planning and coordinating with affected community members. *Id.* ¶¶ 16-17. In fact, the Airport's Noise Abatement Manager now dedicates most of his time to investigating and responding to complaints associated with the Orders. *Id.* The County also incurred costs from the relocation of three noise monitors, which needed to be moved to reflect the change in flight paths resulting from the Orders. *Id.* ¶ 19.

*Finally*, the County has also incurred procedural injury. As discussed below, the FAA's procedural shortcomings are myriad and directly implicate the County's interests. *See Dania Beach*, 485 F.3d at 1185 (quoting *City of Waukesha v. EPA*, 320 F.3d 228, 234 (D.C. Cir. 2003)). The FAA's procedural requirements under NEPA, the NHPA,

Section 4(f), and the FAA's own internal operating procedures are "designed to protect some threatened concrete interest of the plaintiff" as they specifically concern the County's operation of the Airport. *Id.*

B. The Orders have injured the City and the Town.

The City and Town have procedural standing. *See City of Waukesha*, 320 F.3d at 234 ("A violation of the procedural requirements of a statute is sufficient to grant a plaintiff standing to sue, so long as the procedural requirement was designed to protect some threatened concrete interest of the plaintiff."). Here, both municipalities have demonstrated their particularized interests in preserving and protecting their aesthetic environments, natural resources, and historic resources. Specifically, the City and Town have adopted ordinances aimed at ensuring quiet, peaceable environments for their residents; have enacted measures to protect their natural resources, including parks and recreation areas; and maintained robust historic preservation programs. James Decl. ¶¶ 6-8, 18-21, 29-30; Blouin Decl. ¶¶ 6-8, 19-20, 27-28.

These are precisely the concrete interests that NEPA, the NHPA, Section 4(f), and the FAA's implementing procedures were designed to

protect. *See Narragansett Indian Tribe v. McMaster*, No. 24-5193, 2026 WL 1450020, at *1 (D.C. Cir. May 22, 2026) (NHPA "requires federal agencies . . . to take into account the effect of the undertaking on any historic property"); *Dania Beach*, 485 F.3d at 1186 (NEPA's procedural requirements "were designed to protect persons . . . who might be injured by hasty federal actions taken without regard for possible environmental consequences"); *Allison v. Dep't of Transp.*, 908 F.2d 1024, 1027 (D.C. Cir. 1990) (Section 4(f) is designed to "preserve the natural beauty of the countryside and public park and recreation lands").

Nonetheless, and as explained below, the FAA failed to comply with many of the procedures required by these statutes—namely, its obligation to conduct a NEPA environmental review and its consultation obligations under the NHPA and Section 4(f)—prior to implementing the Orders. These are "archetypal procedural injur[ies]." *See Ctr. for Biological Diversity v. Zeldin*, 171 F.4th 356, 374 (D.C. Cir. 2026) (citation omitted); *Dania Beach*, 485 F.3d at 1185.

The FAA's procedural missteps directly led to its erroneous implementation of the Orders, which were predicated on the agency's

flawed and inadequate environmental review. *See* AR00764 (agency's completion of its "[r]eview of the environmental and regulatory requirements" supported publication of the Orders). As a result, the Orders have directly harmed—and will continue to harm—the City's and Town's aforementioned interests.

Specifically, the Orders "route and concentrate air traffic over noise sensitive areas," including residential neighborhoods, "that previously experienced this level of noise only occasionally." AR00346. This has decimated the quiet aesthetic that the City and Town have sought to protect and led to an outcry from residents. James Decl. ¶¶ 7-9; Blouin Decl. ¶¶ 7-10, Exs. A-I; AR00342; AR00711; AR00735; AR00745. This has harmed the City's and Town's concrete environmental interests. *City of Las Vegas,* 570 F.3d at 1114 (city's "interests in the environment and in land management" were threatened where proposed flight path changes "direct[ed] flights over densely populated parts of the city").

Further compounding the harm, the sight and sounds of aircraft have substantially impaired the City's and Town's historic and natural resources. Numerous historic sites and residential districts, as well as

City- and Town-owned parks and recreation areas that once offered scenic views and quiet environments, are now constantly subjected to the intrusive sight of low-flying aircraft, vibrations, and substantially increased aircraft noise that is so loud it inhibits face-to-face conversation. James Decl. ¶¶ 9-16, 22-25; Blouin Decl. ¶¶ 9-17, 21-23; Horn Decl. ¶¶ 5-7; Caler Decl. ¶¶ 5-7; *see* AR02032 (the Redesigned Procedures will "result in reportable [noise] increases over [the Town] and the eastern coast of [the City]"); AR02042-43 (discussing reportable noise increases over the City and Town due to the Redesigned Procedures). This harms the City's and Town's interest in preserving their natural and historic resources.

C. Petitioners' injuries were caused by the Orders and are redressable by the Court.

The above-described injuries of the County, the City, and the Town are the result of the Orders. Moreover, a favorable decision from the Court setting aside the Orders would redress these harms, by allowing the County to resume normal operations at the Airport, requiring the FAA to engage in appropriate consultation and consider less impactful

alternatives, and eliminating the adverse impact on the City's and Town's noise-sensitive resources.

## ARGUMENT

### I. THE FAA'S ESTABLISHMENT OF THE NATIONAL DEFENSE AIRSPACE OVER MAR-A-LAGO VIOLATES THE APA AND APPLICABLE ENVIRONMENTAL REVIEW STATUTES

#### A. <u>The FAA failed to follow mandatory notice-and-comment procedures.</u>

The FAA violated the ADA in establishing the National Defense Airspace because it did not comply with notice-and-comment procedures. *See* 5 U.S.C. § 553(b). Rather, the FAA established the National Defense Airspace through a "Notice to Airmen" that was not published in the Federal Register, did not provide an opportunity for comment, and did not recite good cause for dispensing with the APA's public notice-and-comment procedures. AR00328-29.

There is also no statutory exception to notice-and-comment requirements available here. The FAA expressly invoked Section 40103(b) to establish the National Defense Airspace, AR00328, which makes clear that notice-and-comment is required "notwithstanding the military exception in section 553(a)(1)." 49 U.S.C. § 40103(b)(4). And

there is no doubt that the National Defense Airspace—which punishes incursions through criminal charges or the use of deadly force, AR00328—is a "legislative rule" for which notice-and-comment is required. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 215 (2016). The FAA's failure to follow notice-and-comment procedures renders its establishment of the National Defense Area unlawful. *City of Billings v. Transp. Sec. Admin.*, 153 F.4th 46, 51-54 (D.C. Cir. 2025).

Public notice was also required under the FAA's own procedures. FAA Order 7400.2R outlines the process by which the FAA "establish[es]/designate[s] airspace in the interest of national defense, security, or interest," known collectively as "special use airspace." AR04540.[10] Order 7400.2R expressly requires the FAA to "invite the public to comment on the impact of [special use airspace] proposals on

[10] The FAA at times refers to the restriction over Mar-a-Lago as a TFR, but it is clearly "special use airspace" subject to Order 7400.2R. AR00495 (formally referring to the airspace over Mar-a-Lago as "Special Use Airspace"); *North Carolina v. FAA*, 957 F.2d 1125, 1128 (4th Cir. 1992) (characterizing airspace restricted pursuant to section 40103(b)(3)'s predecessor statute as "special use airspace").

the safe and efficient use of the navigable airspace." *See* AR04542-44 (outlining the applicable "[p]ublic notice procedures").

Indeed, the FAA *has* published notice and sought public comment for its establishment of a "Prohibited Area" over the President's New York residence, which the Secret Service requested contemporaneously with its request for the National Defense Airspace. 91 Fed. Reg. 23,187 (Apr. 30, 2026); AR00178; *see also* 91 Fed. Reg. at 23,188 (listing other examples where the FAA followed notice-and-comment requirements in establishing airspace restrictions for Presidential protection). And the FAA previously acknowledged that any restriction over Mar-a-Lago would need to comply with notice-and-comment procedures. AR00169.

The FAA's failure to follow these procedures with respect to the National Defense Airspace requires the Court to set the FAA's Orders aside. *Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (agency action must "be set aside as arbitrary and capricious if the agency fails to comply with its own regulations."); *see also BFI Waste Sys. of N. Am., Inc. v. FAA*, 293 F.3d 527, 533 (D.C. Cir. 2002) (granting petition for review based on the FAA's failure to comply

with Order 7400.2); *Backcountry Against Dumps v. FAA*, 77 F.4th 1260, 1270 (9th Cir. 2023) (same).

B. The National Defense Airspace is inconsistent with statutory criteria and not the product of reasoned decisionmaking.

The FAA's establishment of the National Defense Airspace is also arbitrary and capricious because it was adopted contrary to the FAA's statutory authority and is not the product of "reasoned decisionmaking."

It is a "basic principle of administrative law" that "agencies must comply with the requirements and limits contained in the text of applicable statutes." *City of Anaheim v. FERC*, 558 F.3d 521, 522 (D.C. Cir. 2009). The FAA failed to do so here in multiple ways.

*First,* the FAA expressly invoked Section 40103(b)(3) to establish the National Defense Airspace. AR00333. That statute requires the FAA to consult with the Secretary of Defense prior to establishing national defense airspace. 49 U.S.C. § 40103(b)(3). There is no record evidence the FAA did so.[11] The FAA's unilateral designation of the National

[11] It appears the only other federal agency with any involvement was the Secret Service, a law enforcement agency "within the Department of

Defense Airspace was accordingly unlawful. *See Vill. of Bensenville v. FAA*, 376 F.3d 1114, 1122-23 (D.C. Cir. 2004) (granting petition based on the FAA's failure to comply with the Federal Aviation Act).

*Second*, Section 40103(b)(3) requires the FAA to preserve "maximum use of the navigable airspace by civil aircraft consistent with national security," and restrict only those aircraft it "cannot identify, locate, and control." In discharging this obligation, the FAA must "engage in reasoned decisionmaking," *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020), by "articulat[ing] a satisfactory explanation for its action[s] including a rational connection between the facts found and the choice made," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The FAA's establishment of the National Defense Airspace fails these standards because the Administrative Record establishes no link between Presidential security and the prohibition of *all* aircraft over

---

Homeland Security." *Jud. Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 895 F.3d 770, 776 n.1 (D.C. Cir. 2018).

Mar-a-Lago at *all* times. The Court "must be able to discern the why and wherefore of the agency's decision-making process." *Solondz v. FAA*, 141 F.4th 268, 277 (D.C. Cir. 2025) (citation modified). But the FAA's decision to grant the Secret Service's request in full does not provide any explanation for the agency's choices. AR00224-25.

Indeed, the only explanation the FAA has offered for the National Defense Airspace is simply that the Secret Service asked for it. Nothing in the Administrative Record explains how the requested "24/7/365" prohibition preserves "maximum use of the navigable airspace by civil aircraft consistent with national security." *See* 49 U.S.C. § 40103(b)(3). Nothing in the Administrative Record explains why the National Defense Airspace excludes even aircraft that the FAA *can* "identify, locate, and control," contrary to Section 40103(b)(3)(B).[12] Nothing in the Administrative Record explains the physical dimensions of the National Defense Airspace, or why the FAA *increased* its vertical dimension from

[12] Indeed, a comprehensive system is in place to ensure the FAA can identify, locate, and control aircraft near Mar-a-Lago when the President is in residence. AR00009-24.

the 1,000 feet that the Secret Service requested to 2,000 feet above ground level. *Compare* AR00178, *with* AR00333. And nothing in the Administrative Record explains the FAA's abrupt departure from restricting only drones when the President is not at Mar-a-Lago.

Nor can the FAA bootstrap on the Secret Service's request. On its face, the Secret Service's suggestion that it is necessary for the "safety and security of [its] protectee," AR00178, to prohibit aircraft from overflying Mar-a-Lago when he may be thousands of miles away is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. And vague invocations of national security do not suffice. *See Nat'l Trust for Historic Pres. in the U.S. v. Nat'l Park Serv.*, No. 25-3116, 2026 U.S. Dist. LEXIS 83870, at *13 (D.D.C. Apr. 16, 2026) ("[N]ational security is not a blank check to proceed with otherwise unlawful activity."). The FAA must "articulate a *satisfactory* explanation for [its] actions." *State Farm*, 463 U.S. at 43 (emphasis added). Here, the FAA "gave almost no reasons at all . . . [and its] conclusory statements do not suffice to explain its decision." *Encino Motorcars*, 579 U.S. at 224.

The FAA was also not duty-bound to accede to the Secret Service's request. Section 40103(b) required the FAA to perform its own analysis to balance the President's security with maximum civil use of the navigable airspace. 49 U.S.C. 40103(b). Indeed, the FAA acknowledged as much. AR00557 (providing data to assist in "negotiations" with Secret Service); AR00736 ("The Secret Service is not responsible for moving traffic flows."). The FAA's blind consent to the Secret Service's unsupported request requires reversal. *See AMB Onsite Servs.-West, Inc. v. NLRB*, 849 F.3d 1137, 1146 (D.C. Cir. 2017) ("[A]n agency cannot avoid its duty to explain a departure from its own precedent simply by pointing to another agency's unexplained departure from precedent.").

*Third*, the FAA failed to consider important aspects of the problem before it. *State Farm*, 463 U.S. at 43. Before the Secret Service's request was submitted, the FAA recognized that "[t]he proximity of [the Airport] to Mar-a-Lago and the densely populated Palm Beach Area are factors that must be considered" in connection with potential airspace restrictions. AR00158. In the wake of the Secret Service's request,

however, it seems to have forgotten such considerations and ignored the weighty concerns raised by its own subject matter experts.

The FAA's Airport Traffic Manager warned that the Secret Service's request would "definitely add additional risk in the [National Airport System]." AR00544-45. The Chief Operating Officer similarly explained to the Administrator that the request would "creat[e] severe safety, capacity and efficiency impacts that cannot be mitigated in the near term." AR00180. He noted that departure procedures would require substantial redesign, including immediate turns and excessive climb gradients that would "trigger multiple approvals and waives [sic] and would undergo a safety risk assessment with no guarantee of approval." AR00182. He explained such procedural changes would shorten the usable length of the Airport's primary runway, *id.*, which "shocked" the FAA's Airports Division when they learned of it, AR00594. And he warned that the National Defense Airspace would result in increased workload for air traffic controllers and reduced redundancy, among other "operational risks." AR00183.

The Chief Operating Officer laid out specific recommendations for how the FAA could avoid these problems, AR00180-183, but the FAA did not adopt them, and the Administrative Record does not explain why. Even FAA staff seemed confused. In memoranda predating the Secret Service's request, FAA staff consistently assumed that any restriction over Mar-a-Lago would not apply to commercial airlines. AR00158 (describing "exceptions for 14 CFR Part 121 operators"), AR00168 ("scheduled air carriers would be exempt from avoiding the National Defense Airspace"). And in the "rush job" to consider the Secret Service's request, *see* AR00317, staff expressed confusion over whether "commercial or General Aviation (GA) aircraft will be able to fly through the TFR," but "hope[d]" that commercial airlines would be exempt. AR00553. The FAA's failure to consider, or explain its reasons for rejecting, such an exemption—particularly in light of its obligation to ensure "maximum use of the navigable airspace by civil aircraft consistent with national security" and restrict only those aircraft it cannot "identify, locate, and control," 49 U.S.C. § 40103(b)—is fatal. *Cincinnati Bell Tel. Co. v. FCC*, 69 F.3d 752, 761 (6th Cir. 1995) (an

agency "is required to give an explanation when it declines to adopt less restrictive measures in promulgating its rules").

Because the FAA's establishment of the National Defense Airspace "is not reasonable and reasonably explained," the Court must set it aside. *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (citation modified).

C. The FAA failed to conduct any environmental review.

The FAA also treated the National Defense Airspace as wholly exempt from environmental review, in violation of NEPA and the agency's NEPA-implementing procedures.

NEPA requires federal agencies to "consider every significant aspect of the environmental impact of a proposed action" prior to taking that action. *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 107 (1983). "This process ensures that *before* an agency acts, it will have available and carefully consider detailed information concerning significant environmental impacts." *City of Phoenix v. Huerta*, 869 F.3d 963, 971 (D.C. Cir. 2017) (citation modified). The FAA has recognized that the establishment of "national defense areas" are generally subject to such environmental review. *See* AR04541-42 ("[Special use airspace]

actions are subject to environmental impact analysis in accordance with [NEPA]"); *see also* AR04748 (identifying special use airspace as a type of action normally requiring an environmental assessment).

Here, however, the FAA skirted NEPA altogether by classifying its establishment of the National Defense Airspace as a "ministerial" or "advisory" action. AR01991-92. Neither classification applies.

To be sure, NEPA does exclude certain "nondiscretionary actions" from environmental review. 42 U.S.C. § 4336e(10)(B)(vii). If an agency "does not have sufficient discretion to affect the outcome of its actions, and its role is merely ministerial, the information that NEPA provides can have no [e]ffect on the agency's actions, and therefore NEPA is inapplicable." *Citizens Against Rails-to-Trails v. Surface Transp. Bd.*, 267 F.3d 1144, 1151 (D.C. Cir. 2001). The FAA's procedures elaborate on this exclusion, explaining that NEPA does not apply where "Congress by statute has prescribed decisional criteria with sufficient completeness and precision such that FAA retains no residual discretion to alter its action based on the consideration of environmental factors." AR04738.

But the FAA's establishment of the National Defense Airspace does not qualify for this treatment. The National Defense Airspace was not implemented pursuant to any congressionally-prescribed criteria that deprived the FAA of discretion. Rather, the National Defense Airspace was implemented in response to a request from the Secret Service that did not identify any statutory requirement to implement the National Defense Airspace; it merely "request[ed] the FAA's support," gave only the barest of reasons for its request, and asked about "next steps in the review and approval process." AR00178.

Moreover, the controlling statute *expressly requires* the FAA to exercise discretion to balance national security and maximum use of the navigable airspace and "decide" when and to what extent national defense airspace is necessary. 49 U.S.C. § 40103(b)(3). Nothing in Section 40103(b)(3) requires the FAA to establish any particular area as national defense airspace—including when requested to do so.

The Administrative Record also reflects that the FAA was exercising, and not deprived of, its discretion with respect to the National Defense Airspace. The Chief Operating Officer's memorandum to the

Administrator detailed anticipated operational impacts of the Secret Service's request, proposed modifications to reduce those impacts, and noted noise abatement and community impact concerns. AR00180-83. A week later, the Administrator updated the Secret Service that the FAA had "analyzed the operational implications [of the requested National Defense Airspace] and developed a recommended action plan for consideration." AR00224; *see also* AR00557 (FAA staff communications referring to "negotiations" with the Secret Service); AR00736 ("The Secret Service is not responsible for moving traffic flows.").

The FAA's exclusive authority to determine the parameters of the National Defense Airspace is a far cry from cases where NEPA has been held inapplicable because an agency's hands are tied or the action is purely ministerial. *See, e.g.*, *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 769 (2004) (agency not required to evaluate environmental impact "of an action it could not refuse to perform" because Congress mandated action); *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1096 (9th Cir. 2013) (classifying input of mine reclamation data into software and approval of updated reclamation bond amount as "ministerial," "post-

project approval functions" that did not trigger NEPA review). The FAA may have chosen to exercise its discretion exactly as the Secret Service asked it to, but that does not mean it had no discretion to exercise.

*Second*, the FAA's establishment of the National Defense Airspace was not exempt from NEPA because it was only "advisory in nature," as the FAA claimed. AR01991. Actions are excluded from NEPA review as "advisory" when the FAA "does not have substantial control or responsibility over their outcome" because it is merely providing information, not forcing action. AR04739. But here, the FAA's designation of the National Defense Airspace was action-forcing and required immediate compliance from all aircraft traveling near Mar-a-Lago, as well as implementation of procedural amendments by the FAA. AR00333; AR00637. It cannot be considered "advisory."

Moreover, only two types of special use airspace are "advisory": alert areas and warning areas. AR04739. The designation of these areas informs or warns pilots of unusual activity or hazards but does not impose restrictions on where they can fly. AR04581, 04590. The

National Defense Airspace is neither: it prohibits aircraft from overflying Mar-a-Lago under threat of criminal penalties or lethal force. AR00333.

Other than these two types of special use airspace "explicitly listed as an advisory action," the designation of special use airspace requires an environmental assessment. AR04748; *see also* AR04541-42 (describing NEPA requirements for special use airspace actions other than designation of alert areas and warning areas). In sum, it was arbitrary and capricious for the FAA to exclude designation of the National Defense Airspace from NEPA review.

Finally, beyond NEPA, the FAA also failed to evaluate the impacts of the National Defense Airspace on historic properties and park and recreation areas as required by the NHPA and Section 4(f). *See* 54 U.S.C. § 306108; 49 U.S.C. § 303; *see also* AR04741 (requiring FAA compliance with these statutory provisions). The Administrative Record lacks any indication the FAA complied with the requirements of those statutes before establishing the National Defense Airspace.

## II. THE FAA'S MODIFICATION OF THE AIRPORT'S DEPARTURE AND ARRIVAL PROCEDURES SOLELY TO AVOID OVERFLIGHT OF MAR-A-LAGO VIOLATES THE APA AND APPLICABLE ENVIRONMENTAL REVIEW STATUTES

After unlawfully establishing the National Defense Airspace, the FAA set about finalizing the Redesigned Procedures to formalize the ad hoc procedures established through the LTAs, ensuring that arriving and departing aircraft would not overfly Mar-a-Lago, and concentrating such aircraft over neighborhoods not previously exposed to aircraft noise. The Redesigned Procedures, too, are arbitrary and capricious.

### A. There is no "reasoned basis" for the Redesigned Procedures.

Initially, the FAA did not and cannot articulate any reason for changing the Airport's long-standing arrival and departure paths *other* than avoiding the National Defense Airspace, which, as described above, was not the product of reasoned decisionmaking. *See* AR01999. The FAA's failure to "consider responsible alternatives" to the National Defense Airspace, *Spirit Airlines, Inc. v. U.S. Dep't of Transp.*, 997 F.3d 1247, 1255 (D.C. Cir. 2021), irreparably infected its analysis of the Redesigned Procedures; indeed, the FAA did not consider *any* alternative to the Redesigned Procedures that would maintain the safety and

efficiency of the Airport's existing procedures. AR01999. Because the FAA's only explanation for the Redesigned Procedures was itself unlawful, the Redesigned Procedures must also be vacated.

### B. The FAA arbitrarily and capriciously applied a categorical exclusion to avoid more detailed NEPA review of the Redesigned Procedures.

The FAA also applied a categorical exclusion to avoid detailed environmental review and public disclosure of the Redesigned Procedures, in violation of NEPA and the FAA's own procedures.

NEPA typically requires agencies to evaluate environmental impacts of proposed actions by preparing an environmental assessment or environmental impact statement, but agency actions that "normally do[] not significantly affect the quality of the human environment" may be excluded from more detailed environmental review. AR04743; *City of Phoenix*, 869 F.3d at 971-72. The FAA's list of such "categorical exclusions" includes certain flight procedure actions. AR04787. After months of strategizing over how to insulate the Redesigned Procedures from NEPA review, *see* AR00347, 00724, 00739, the FAA ultimately invoked a categorical exclusion that applies to "modifications to currently

approved procedures conducted below 3,000 feet AGL that do not significantly increase noise over noise-sensitive areas." AR02000.

But even when a categorical exclusion *may* apply (and, here, one does not), the FAA must evaluate the action for the presence of "extraordinary circumstances" that would make use of a categorical exclusion inappropriate. AR04744. The FAA failed to do so.

i. *The FAA wrongly invoked a categorical exclusion to implement the Redesigned Procedures, which rerouted aircraft over noise-sensitive areas.*

The FAA's reliance on its chosen categorical exclusion was improper because the agency did not merely "modif[y]" flight procedures, it fully redesigned them, and in a way that routinely routes aircraft over noise-sensitive areas *for the first time*. AR02000.

*First*, although the names of the Redesigned Procedures may be the same, that linguistic fig leaf is merely an attempt to shoehorn the Redesigned Procedures into a categorical exclusion. *See* AR02054 (internal email stating categorical exclusion would be used "due to the short notice for publishing new procedures"). The record shows that the procedures were not merely modified—they were completely overhauled,

comprising new flight paths, new turns, and non-standard climb rates. FAA personnel repeatedly characterized the agency's action as a complete "redesign" of the Airport's procedures. *E.g.*, AR00338, 00541-43, 00582, 00608, 00654, 00672, 00744.

*Second*, the Redesigned Procedures permanently route aircraft over noise-sensitive areas not previously exposed to such air traffic. AR00346-47, 00531. That precludes the application of the categorical exclusion the FAA invoked. The FAA's NEPA procedures are clear that new and modified procedures "that routinely route aircraft over noise sensitive areas at less than 3,000 feet above ground level" normally require an environmental assessment. AR04748. Flight procedure actions that change the routine routing of aircraft may only be approved with a categorical exclusion when they either "do not cause traffic to be routinely routed over noise sensitive areas" or "routinely route aircraft over *non*-noise sensitive areas." AR04787-88 (emphasis added).

These provisions make clear that the impacts of new or redesigned procedures that routinely route aircraft over noise-sensitive areas must be evaluated through an environmental assessment and not summarily

dismissed by categorical exclusion. The FAA violated this requirement here by authorizing the routine routing of aircraft over noise-sensitive areas through wrongful application of a categorical exclusion. *See Wilderness Watch v. Mainella*, 375 F.3d 1085, 1094-95 (11th Cir. 2004).

ii. *The FAA failed to properly consider the presence of extraordinary circumstances.*

The FAA's application of a categorical exclusion to the Redesigned Procedures was also flawed because the FAA failed to consider the "extraordinary circumstances" presented by its controversial actions.

The FAA may not apply a categorical exclusion without first evaluating its proposed action for "extraordinary circumstances" that indicate the action "is likely to have reasonably foreseeable significant adverse impact(s)." AR04744. If the FAA determines that no extraordinary circumstances exist, it must document and explain that conclusion before proceeding with a categorical exclusion. AR04745. If the FAA determines extraordinary circumstances do exist, it must conduct a more detailed environmental review. AR04744.

The FAA's NEPA procedures identify situations that may present "extraordinary circumstances" if they "ha[ve] the potential for a

significant effect." AR04777-78. Relevant here, the FAA has determined that extraordinary circumstances may exist if the effects of the proposed action "are likely to be highly controversial on environmental grounds," for example, if there is "reasonable disagreement over the degree, extent, or nature of a proposed action's environmental impacts." AR04778. When determining whether reasonable disagreement exists, the FAA considers opposition by a local government or a "substantial number of the persons affected by the action." *Id.*

Here, however, the FAA's Categorical Exclusion Document boldly concluded that the Redesigned Procedures are "not expected to . . . involve any extraordinary circumstances." AR02002. But there is no record of the potential extraordinary circumstances the FAA considered or why the FAA determined they were not present. Although the omission of these details does not automatically render a categorical exclusion determination deficient, AR04745, here it seriously calls into question whether the FAA considered extraordinary circumstances at all, *see id.* (requiring additional documentation for actions involving aircraft

over noise-sensitive areas, known controversies and significant public opposition, and anticipated litigation).

Indeed, the Administrative Record is abundantly clear that the FAA was aware of substantial local government and general public opposition to the Redesigned Procedures. *E.g.*, AR00343 (discussing media coverage and complaints "start[ing] to roll in," including from the Town); AR00531 (anticipating congressional complaints and litigation); AR00690 (referring to community "outcry" regarding "new flightpaths"); AR00711 (describing exponential increase in noise complaints as well as fact that "local county commissioners and mayors are wanting answers"); AR00713-21 (strategizing a response to County's written objections and concerns regarding Redesigned Procedures); AR00725 (noting "a lot of publicity with these new routes" and requesting agency attendance at meeting with local politicians and news coverage); AR00735 ("The FAA has received a letter from the Airport Operator, congressional inquiries, resident complaints, and an invitation to speak at the community noise roundtable, all because of the flight path changes . . . ."); AR00740-41

(brainstorming ways for NEPA review to "quash any noise complaints, legitimate tho [sic] they may be").

Yet the FAA *actively prevented* interested stakeholders from learning about and commenting on its actions. The Redesigned Procedures formalized earlier procedural amendments that the FAA kept from the public—and even from the County, the operator of the Airport—until they were final. AR00473 (meeting request to brief Airport and other stakeholders on "already . . . developed and approved" procedural amendments they were "unaware of"); AR00592 (instructing FAA staff not to engage the County to identify impacts); AR00686 (rejecting approval for an "Outward Facing Meeting Request" to discuss the Redesigned Procedures). And the FAA did not seek nor consider stakeholder input even when finalizing the Redesigned Procedures. *See* AR00717-21, 00746; Exhibit 2.

This Court has previously held that when the FAA fails to notify "local citizens and community leaders" of flight procedure changes before they go into effect, it is "impossible for the FAA to take into account" potential controversy to evaluate the presence of extraordinary

circumstances, and it is arbitrary and capricious for the FAA to rely on a categorical exclusion. *See City of Phoenix*, 869 F.3d at 972 (citations omitted); *see also Am. Bird Conservancy, Inc. v. FCC*, 516 F.3d 1027, 1035 (D.C. Cir. 2008) (finding that agency failed to comply with own NEPA procedures and explaining that "[i]nterested persons cannot request an EA for actions they do not know about, much less for actions already completed"). The Court should reach the same conclusion here.

Even if the FAA could have abbreviated its consideration of extraordinary circumstances based on its conclusion that the Redesigned Procedures would not result in "significant" noise increases, its choice to proceed with a categorical exclusion was still arbitrary and capricious.

*First*, the FAA has previously considered flight procedure changes "highly controversial" for extraordinary circumstances purposes if they result in increases in noise levels that are "reportable," even if not "significant." *See City of Phoenix*, 869 F.3d at 972 (describing prior agency characterization of changes that "increase sound levels by five or more decibels in an area already experiencing average levels of 45-60 decibels," as a reportable increase). Here, the FAA's noise screening

analysis indicated increases of that magnitude. AR02001, 02040-42. The FAA's failure to consider these reportable increases as indicative of extraordinary circumstances is an arbitrary and capricious departure from past practice. *See City of Phoenix*, 869 F.3d at 972-73.

*Second*, the record shows the FAA expected the Redesigned Procedures to have a significant effect on communities not previously under routine flight paths. *See* AR00740-41 (offering potential justifications for flight procedure changes "even though the one flight procedure alternative would breach the accepted noise significance threshold"); *see also* AR00346-47, 00531. While the FAA ultimately prepared a noise screening analysis showing reportable but not significant effects, its awareness of the potentially significant impacts of its action was enough to warrant further study. *See* AR04777 (potential for extraordinary circumstances when proposed action "*[m]ay* have a significant effect" (emphasis added)).

*Third*, the FAA's noise screening analysis concluding the Redesigned Procedures would not result in "significant" impacts was flawed. Its analysis purports to have used historical flight track data

from randomly selected days prior to the establishment of the National Defense Airspace to establish a noise baseline that could be compared to noise modeling for the proposed Redesigned Procedures. AR02032, 02034. However, the analysis erroneously incorporated data from December 20, 2025—months after the National Defense Airspace was implemented and aircraft were being directed around it—into the baseline. *See* AR02035. This methodological error skewed the baseline flight route model. Given that the noise screening analysis showed "reportable" increases in noise, *see* AR02042-44, correcting the skewed baseline could reveal impacts that meet or exceed the FAA's significance threshold for noise impacts, *see* AR02040, 04772. And a significant increase in noise would prevent the FAA from applying the categorical exclusion it used here altogether. *See* AR02000.

This Court has previously vacated FAA action where the agency improperly calculated a baseline for evaluating aircraft noise. *See Marin Audubon Soc'y v. FAA*, 121 F.4th 902, 915, 918 (D.C. Cir. 2024). This is problematic, the Court explained, because "[i]f the baseline is artificially high, the agency might erroneously conclude that even highly disruptive

actions will have minimal incremental environmental effects," allowing the agency to "avoid conducting a more comprehensive environmental analysis required by NEPA." *Id.* at 916. That is what happened here.

### C. The FAA failed to consider the impact of the Redesigned Procedures on historic properties under the NHPA.

The FAA also adopted the Redesigned Procedures in violation of the NHPA. The NHPA comprises "a series of measures designed to encourage preservation of sites and structures of historic, architectural, or cultural significance." *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 108, n.1 (1978). To ensure the protection of such properties is considered before an agency acts, the NHPA and its implementing regulations require agencies to identify the "area of potential effects" of a proposed agency action (referred to as an "undertaking"); identify historic properties in that area; consult with interested stakeholders, including local governments, about historic properties and potential impacts; and work to minimize adverse effects. *See* 54 U.S.C. § 306108; 36 C.F.R. §§ 800.4-800.6. Consultation requires "seeking, discussing, and considering the views of other participants, and, where feasible, seeking agreement with them regarding matters arising in the section 106

process." *Eagle Cnty. v. Surface Transp. Bd.*, 82 F.4th 1152, 1189 (D.C. Cir. 2023), *rev'd and remanded on other grounds sub nom. Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168 (2025).

The FAA acknowledged that the Redesigned Procedures were an undertaking subject to, and requiring consultation under, section 106. AR02049. Nonetheless, the FAA paid mere lip service to section 106's requirements and violated the NHPA when it failed to properly consult with the requisite parties, failed to adequately identify and consider effects on historic properties, and arbitrarily issued a "No Adverse Effect" determination for the Redesigned Procedures.

i. *The FAA violated NHPA consultation requirements.*

The NHPA's implementing regulations outline the "consulting parties" an agency must involve in the section 106 process, including the SHPO, representatives of local governments, and individuals and organizations with a demonstrated interest in the undertaking. 36 C.F.R. § 800.2(c). Agencies must also "seek and consider the views of the public." *Id.* § 800.2(d)(1). In addition to engaging all these constituents at the outset of the process, the agency must notify them of

its determination whether or not the undertaking will have an adverse effect on historic properties. *See id.* § 800.4(d)(1). A consulting party may then challenge an agency's finding of "no adverse effect." *See id.* § 800.5(c). The FAA failed to comply with these requirements.

*First*, the FAA failed to adequately consult with the SHPO. "[C]onsultation with the SHPO is an integral part of the section 106 process." *Pueblo of Sandia v. United States*, 50 F.3d 856, 862 (10th Cir. 1995). Although required by section 106, there is no evidence in the Administrative Record that the FAA consulted the SHPO to determine the area of potential effect or to identify historic properties in that area. *See* 36 C.F.R. § 800.4(a)-(b). Nor is there any evidence of consultation related to the essential tasks of identifying other consulting parties or engaging the public. *Id.* § 800.3(e)-(f).

The Administrative Record contains only *one* communication from the FAA to the deputy SHPO, sent on January 15, 2026—seven days before the FAA published the Redesigned Procedures. AR02057. This email requested "expedited review" of a letter containing the FAA's section 106 determination. *Id.* The letter claimed to be "initiat[ing]

consultation under Section 106" but, *at the same time*, requested the SHPO's "concurrence with [the FAA's] finding of No Adverse Effect on historic properties." AR02049, 02052. In other words, the FAA waited to consult the SHPO until the FAA's section 106 process was, in the FAA's view, already complete, failing to meaningfully engage the SHPO at the outset or during that process, in violation of federal regulations and agency procedures.[13] *See* 36 C.F.R. §§ 800.3(e)-(f), 800.4(a)-(b); AR04741 (requiring the FAA to comply with section 106 and conduct consultation concurrently with its NEPA process).

*Second*, the FAA failed to engage or invite the participation of other consulting parties and the public. There is no evidence, for example, that the FAA attempted to consult (much less did consult) with Petitioners, who are all local governments with jurisdiction over the area potentially

[13] While the NHPA provides for "[e]xpedit[ed] consultation," through which a consultation can "address multiple steps" in the section 106 process, it is not clear from the Administrative Record that this process was invoked here. 36 C.F.R. § 800.3(g). Moreover, the agency must still ensure that "consulting parties and the public have an adequate opportunity to express their views." *Id.* As discussed below, the FAA afforded no such opportunity here.

impacted by the Redesigned Procedures, or with any other individual or organization with a demonstrated interest in the undertaking. *See* 36 C.F.R. § 800.2(c)(3), (5). The FAA did not engage these parties at the beginning of its section 106 process, nor did it even share its proposed "No Adverse Effect" finding with these parties at the end of the process. *See id.* §§ 800.4(a)(3), (d)(1). And there is no evidence the FAA provided the public with information about, or sought public comment and input on, the undertaking and its effect on historic properties. *See id.* § 800.2(d). In fact, the evidence shows the opposite is true. *See* James Decl. ¶¶ 26-28; Blouin Decl. ¶¶ 24-26.

By failing to fulfill these consultation requirements, the FAA denied Petitioners their "right to participate in the [section 106] process and object to the FAA's findings" and made it "impossible for the public to submit views on the [Redesigned Procedures'] potential effects—views that the FAA is required to consider." *City of Phoenix*, 869 F.3d at 971. The FAA violated its NHPA obligations, requiring vacatur of the Redesigned Procedures. *See id.* at 971, 975; *see also City of Los Angeles v. Dickson*, No. 19-71581, 2021 U.S. App. LEXIS 20248, at *6 (9th Cir.

July 8, 2021) ("[T]he FAA's admitted failure to consult with [petitioners] violated NHPA, *even if* the FAA properly determined that there would be no adverse impacts on historic properties." (emphasis added)).

ii. *The FAA failed to adequately evaluate the noise impacts of the Redesigned Procedures on historic properties.*

The FAA's failure to adequately consult with the SHPO and local governments infected the core analytical steps required under section 106—namely, defining the area of potential effect, identifying historic properties, and evaluating effects on those properties. *See* 36 C.F.R. §§ 800.4(a), (b)(1), 800.5. These procedural deficiencies are fatal.

*First*, without consulting the SHPO, the FAA selected an area of potential effect using the noise screening analysis prepared as part of its environmental review. AR02051. As discussed above, the FAA's noise screening analysis was flawed and underreported noise impacts. *Supra*, at 54-55. The FAA's area of potential effect therefore may not cover the entire potentially affected area, and it cannot be determined whether the FAA properly defined the geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties. *See* 36 C.F.R. § 800.16(d).

*Second*, the FAA failed to recognize at least one historic site listed on the National Register of Historic Places as falling within the area of potential effect: the Palm Beach Daily News Building, located at 204 Brazilian Avenue in the Town of Palm Beach and squarely within the area experiencing noise impacts from the Redesigned Procedures. *See* AR02052 (omitting building from list of potentially affected properties); Blouin Decl. ¶¶ 21-23, Ex. J. And although the City, Town, and County have adopted historic preservation regulations and maintain historic registers, *see* James Decl. ¶¶ 18-22; Blouin Decl. ¶¶ 18-21, Ex. J, the record contains no evidence that the FAA accounted for these local frameworks in its analysis or considered properties that are not yet listed in the National Register but are nevertheless eligible for listing. *See* 36 C.F.R. § 800.4(a)(2), (b)(1), (c)(1) (requiring consideration of eligible, but not yet listed, sites and local standards). These are not minor omissions; they prove the FAA failed to consult with local governments and other knowledgeable parties as required.

*Third*, for those historic properties the FAA *did* identify as potentially affected by the Redesigned Procedures, the FAA conducted a

flawed analysis because it did not adequately consider whether those properties would be affected by noise increases of a lesser magnitude than what the FAA considers "significant."

In its letter to the SHPO describing its "No Adverse Effect" determination, the FAA acknowledged that its typical "significance" threshold for noise impacts "may not be relevant to certain historic sites." AR02050; *see* AR04794. For example, there may be historic properties "where a quiet setting is a generally recognized purpose and attribute." AR04794. The FAA therefore purported to consider properties in areas with lower levels of noise exposure that would experience a "noticeable" (referred to as a "reportable") increase in noise. AR02050.

Yet the FAA's analysis does not explain whether or how it evaluated such impacts to historic properties experiencing "reportable" noise increases. Instead, the Categorical Exclusion Document reduces this analysis to a conclusory statement that the historic sites identified "were architecture related" and that "the expected noise increases would not harm the structures." AR02001. Had the FAA followed NHPA consultation requirements, it would have received information to the

contrary demonstrating that noise impacts in the area do *not* turn solely on physical damage to structures, and that the use and setting of the properties must also be considered. *See* James Decl. ¶¶ 24-25; Blouin Decl. ¶ 23. It also would have learned of the Town's and the City's concerns that prolonged exposure to vibrations from aircraft could damage their historic properties. James Decl. ¶ 25; Blouin Decl. ¶ 23.

Indeed, the agency appears to have incorrectly concluded that there were no affected historic properties within the area of potential effect. But the Norton House lies under the path of the Redesigned Procedures and is a historic property where a quiet setting is a generally recognized purpose and attribute.[14] *See* AR02052 (including Norton House in list of historic places within area of potential effect). A quiet setting is also a

---

[14] *See* Anne Norton House and Sculpture Gardens, National Register of Historic Places Continuation Sheet § 7, at 2 (identifying 35-foot reflecting pool as qualifying characteristic), https://catalog.archives.gov/id/77843513; Ann Norton Sculpture Gardens, The Gardens & Sculptures, https://ansg.org/about/#garden-a (last accessed May 11, 2026) (describing the gardens surrounding the Norton House: "The Gardens . . . represent Ann's commitment to conservation and the *preservation of a quiet retreat* in the midst of a burgeoning city." (emphasis added)).

generally recognized purpose and attribute of the City's historic residential districts, as well as the historic Everglades Club, all of which are now subject to severe aircraft noise. James Decl. ¶ 24; Caler Decl. ¶¶ 5-7. The FAA provides no analysis of noise impacts to the setting or use of these historic properties and districts, or any other identified historic properties. In fact, despite purporting to consider "noticeable" effects, and acknowledging that noise thresholds may not be relevant to determining impacts on certain quiet-setting historic sites, the FAA discussed only "significant" noise impacts. *See* AR02052.

For these reasons, the FAA's determination that the Redesigned Procedures would not have any impact on historic properties is based on conclusory assertions without supporting analysis and must be set aside. *See, e.g.*, *Clark Cnty. v. FAA*, 522 F.3d 437, 441-42 (D.C. Cir. 2008) (conclusory statements do not constitute reasoned decisionmaking).

D. The FAA failed to comply with Section 4(f) and failed to consider the impact of the Redesigned Procedures on park and recreation areas.

Section 4(f) of the Department of Transportation Act calls for "special effort[s] . . . to preserve the natural beauty of the countryside and

public park and recreation lands, wildlife and waterfowl refuges, and historic sites." 49 U.S.C. § 303(a). Federal transportation agencies may approve a project that "uses" one of these "section 4(f) properties" only if there is "no prudent and feasible alternative to using that land" and the agency engages in "all possible planning" to "minimize harm" to the properties. *Id.* § 303(c); *City of Alexandria v. Slater*, 198 F.3d 862, 871 (D.C. Cir. 1999). This prohibition "extends to constructive use," including increased noise. *Cnty. of Rockland v. FAA*, 335 F. App'x 52, 55 (D.C. Cir. 2009); *see also D.C. Fed'n of Civic Ass'ns v. Volpe*, 459 F.2d 1231, 1239 (D.C. Cir. 1971) ("[A] project which respects a park's territorial integrity may still, by means of noise, air pollution and general unsightliness, dissipate its aesthetic value, crush its wildlife, defoliate its vegetation, and 'take' it in every practical sense.").

An action "constitutes a 'constructive use'" if the action would "substantially impair" a section 4(f) property. AR04769-70. "Substantial impairment occurs when the activities, features, or attributes of the resource that contribute to its significance or enjoyment are substantially diminished." AR04770; *see also City of Grapevine v. Dep't of Transp.*,

17 F.3d 1502, 1507 (D.C. Cir. 1994) ("For the purpose of § 4(f), noise that is inconsistent with a parcel of land's continuing to serve its recreational, refuge, or historical purpose is a 'use' of that land."). Critically, when it comes to noise-related use, the FAA cannot unilaterally assess substantial impairment. Rather, agency personnel "*need* to consult with *all* appropriate Federal, state and local officials having jurisdiction over" the relevant Section 4(f) properties when "determining whether project-related noise impacts would constitute a use of" those properties. AR04662 (emphasis added). Further, the FAA "may not approve the use . . . of Section 4(f) property unless a determination is made under [23 C.F.R. § 774.3(a) or (b)]." 23 C.F.R. § 774.3.

Here, there are numerous section 4(f) properties that now lie under the Airport's modified arrival and departure corridors. This includes not only the historic properties identified above, but a number of City- and Town-owned parks and recreation areas, including Westminster Park, Prospect Park, Monceaux Park, George Petty Park, Lake Drive Park, Lake Trail, Memorial Park and Fountain, Phipps Plaza Park, and

Midtown Municipal Beach. James Decl. ¶¶ 10-15; Blouin Decl. ¶¶ 11-16. Yet the FAA failed to comply with these requirements.

i. *The FAA failed to consult with the appropriate local officials when assessing noise-related constructive use.*

The FAA's procedures plainly require that constructive-use determinations involving increased noise be made in consultation with "*all* appropriate Federal, state, and local officials having jurisdiction over" these section 4(f) properties. AR04662 (emphasis added). In the case of the section 4(f) properties identified here, those officials are Paul Brazil and Leah Rockwell. Blouin Decl. ¶ 18; James Decl. ¶ 17. However, there is no evidence that the FAA ever consulted these officials. *Id.*

Moreover, the section of the FAA's Categorical Exclusion Document pertaining to section 4(f) does not refer to the FAA's consultation obligations, document the FAA's efforts to comply, or set forth any rational explanation for the agency's failure to discharge its obligations under section 4(f). *See* AR02002. Given the FAA's indisputable violation of its own section 4(f) procedures, vacatur is warranted. *City of Phoenix*, 869 F.3d at 973-74 (granting petition for review based on the FAA's failure to consult with the appropriate officials regarding section 4(f)

properties, as required by its procedures); *City of Los Angeles*, 2021 U.S. App. LEXIS 20248, at *8 (granting petition for review where (i) "there [was] no evidence that the FAA ever consulted with the Cities regarding the affected section 4(f) properties," and (ii) the FAA "did not acknowledge its section 4(f) consultation obligation" or "explain why it was excused from consulting").

ii. *The FAA relied upon a flawed noise screening analysis and failed to consider and apply the appropriate factors when assessing use.*

In addition to these errors, the FAA failed to consider the appropriate factors for assessing "use" under section 4(f). Again, that inquiry turns on whether an action would "substantially diminish" the "activities, features, or attributes" of the section 4(f) property that "contribute to its significance or enjoyment." AR04769-70. But here, the FAA's cursory finding that constructive use "would not occur" rests solely on "a review of the proposed changes in aircraft location and the noise screening indicating no significant noise increases." AR02002.

The FAA's reliance on a flawed noise screening, *supra* at 54-55, renders its finding of "no significant noise increases" arbitrary and

capricious. The FAA compounded this error by failing to evaluate the specific activities, features, or attributes that contribute to the significance or enjoyment of the City's and Town's section 4(f) properties, including the quiet environment and scenic views those properties provide. Blouin Decl. ¶¶ 13-16; Horn Decl. ¶¶ 5, 7; James Decl. ¶¶ 10-15. Nothing in the FAA's conclusory finding indicates that it considered these factors at all. The agency did not assess how increased aircraft noise would affect the use, setting, or experiential qualities of the City's and Town's section 4(f) properties, nor did it evaluate whether those impacts would substantially diminish the properties' protected characteristics. This omission renders the FAA's constructive-use determination inadequately supported, and its implementation of the Redesigned Procedures was therefore arbitrary and capricious.

Finally, because it failed to determine that the relevant properties would be constructively used, the FAA consequently failed to issue a determination or obtain the requisite approval under 23 C.F.R. § 774.3 for the Redesigned Procedures' constructive use of the 4(f) properties. Because the FAA failed to properly assess constructive use and consult

the required officials, its section 4(f) determination is arbitrary and capricious and must be set aside.

## III. VACATUR IS THE APPROPRIATE REMEDY

The sum of the multiple substantive and procedural errors committed by the FAA requires vacatur of the Orders establishing the National Defense Airspace and the Redesigned Procedures.

When an agency's action is unlawful, "vacatur is the normal remedy." *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014). In "limited circumstances," a court may exercise its equitable powers to depart from the normal rule and remand without vacating the agency's action, but doing so is an "exceptional remedy." *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 518-19 (D.C. Cir. 2020). To decide whether such an exceptional departure from the norm is warranted, courts consider (1) the "seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly)" and (2) the "disruptive consequences of an interim change that may itself be changed." *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993). Both factors favor vacatur here.

*First*, the deficiencies of the challenged Orders are serious. The FAA did not and cannot demonstrate why the National Defense Airspace was necessary for the President's safety, and the "24/7/365" prohibition of aircraft over Mar-a-Lago is plainly inconsistent with the FAA's responsibility to "allow *maximum* use of the navigable airspace by civil aircraft consistent with national security." *Supra*, at 32-39. These substantive deficiencies severely undermine the Orders and require vacatur. *N.J. Conservation Found. v. FERC*, 111 F.4th 42, 64 (D.C. Cir. 2024) (vacatur appropriate where deficiencies went to the core of an agency's findings and were unlikely to be cured with more explanation).

Nor can the FAA explain its disregard of applicable procedural requirements. The FAA knowingly violated its obligations to obtain public comment and conduct meaningful review of the National Defense Airspace and the Redesigned Procedures. And there is "substantial doubt" that an informed look at these matters would have resulted in the same outcome. *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1052-53 (D.C. Cir. 2021). Indeed, it is clear from the record that FAA senior staff proposed less burdensome alternatives that

may have accomplished the same objective, but the agency failed to consider them. Vacatur is warranted in such circumstance. *See Env't Def. Fund v. FERC*, 2 F.4th 953, 976 (D.C. Cir. 2021).

*Second*, the potential for disruption favors vacatur. Petitioners do not challenge the TFRs that customarily apply when the President is in residence. Those will remain undisturbed. And claims that such TFRs are insufficiently protective should be regarded with skepticism, especially when throughout the first Trump Administration—and every other modern administration—they appear to have satisfied security concerns. The Court need not and should not reflexively defer to incantations of national security when they lack support.

Meanwhile, if the Orders remain in effect, Airport operations would continue to be disrupted, and the environmental impacts of aircraft overflying the City's and Town's noise-sensitive areas not previously exposed to aircraft noise would continue unabated, unnecessarily. Vacatur is therefore appropriate.

## CONCLUSION

The FAA's establishment of the National Defense Airspace over Mar-a-Lago was not justified on any basis and plainly violated the FAA's statutory obligations and internal procedures. It should be set aside as arbitrary and capricious, not in accordance with law, and otherwise erroneous. Because the Redesigned Procedures were adopted solely (and unnecessarily) to avoid the National Defense Airspace, the Redesigned Procedures are also arbitrary and capricious.

The Redesigned Procedures are also independently arbitrary and capricious and not in accordance with law because they were adopted in violation of the FAA's obligations under NEPA, the NHPA, and Section 4(f). The Petitions for Review should be granted, and the Orders establishing the National Defense Airspace and the Redesigned Procedures should be vacated and remanded to the FAA.

Respectfully submitted June 9, 2026,


*/s/ Steven L. Osit*
Steven L. Osit
Samantha R. Caravello
Rebecca Glenn
Kaplan Kirsch LLP
1675 Broadway, Suite 2300
Denver, CO 80202
Telephone: (303) 825-7000
sosit@kaplankirsch.com
scaravello@kaplankirsch.com
rglenn@kaplankirsch.com

*Counsel for Palm Beach County*

*/s/ Jeffrey L. Oldham*
Jeffrey L. Oldham
Jackson Walker LLP
100 Congress Avenue, Suite 1100
Austin, TX 78701
Telephone: (512) 236-2000
joldham@jw.com

Justin V. Lee
Cody Martinez
Jackson Walker LLP
2323 Ross Avenue, Suite 600
Dallas, TX 75201
Telephone: (214) 953-6072
jlee@jw.com
cmartinez@jw.com

*Counsel for Town of Palm Beach and City of West Palm Beach*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Century Schoolbook, a proportionally spaced font.

I further certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,911 words, excluding the parts of the brief exempted under Rule 32(f), according to the count of Microsoft Word.

*/s/ Steven L. Osit*
Steven L. Osit

## CERTIFICATE OF SERVICE

I hereby certify that on June 9, 2026, a true copy of the foregoing Joint Petitioners' Brief was served on all parties of record who are registered CM/ECF filers through the appellate CM/ECF system for the United States Court of Appeals for the D.C. Circuit, including:

Rebecca Jaffe
Allen M. Brabender
U.S. Department of Justice
Environment & Natural Resources
Section, Appellate
P.O. Box 7415
Ben Franklin Station
Washington, D.C. 20044

*Counsel for Federal Aviation Administration*

*/s/Steven L. Osit*
Steven L. Osit