NOT YET SCHEDULED FOR ORAL ARGUMENT

Nos. 25-1282, 25-1283, 26-1034, 26-1035

---

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

PALM BEACH COUNTY, et al.,
*Petitioners*,

v.

FEDERAL AVIATION ADMINISTRATION,
*Respondent*.

---

Petition for Review of Orders of the Federal Aviation Administration

---

**BRIEF FOR RESPONDENT**

---


Of Counsel:

WILLIAM MCKENNA
*Chief Counsel*

MICHAEL FINEMAN
GAHAN CHRISTENSON
LAURA PRICE
*Attorneys*
Federal Aviation Administration

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*

ROBERT N. STANDER
*Deputy Assistant Attorney General*

ALLEN M. BRABENDER
*Attorney*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 532-3281
allen.brabender@usdoj.gov

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A. Parties and Amici

All parties, intervenors, and amici appearing in this Court are listed in the Brief for Petitioners.

### B. Rulings Under Review

References to the orders at issue appear in the Brief for Petitioners.

### C. Related Cases

There are no related cases within the meaning of Circuit Rule 28(a)(1)(C).

/s/ *Allen M. Brabender*
ALLEN M. BRABENDER
*Counsel for Respondent*

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..... i

TABLE OF AUTHORITIES ..... v

GLOSSARY ..... xi

INTRODUCTION ..... 1

STATEMENT OF JURISDICTION ..... 2

STATEMENT OF THE ISSUES ..... 3

PERTINENT STATUTES AND REGULATIONS ..... 3

STATEMENT OF THE CASE ..... 3

A. Statutory and regulatory background ..... 3

1. National Airspace System: Special Security Instructions versus Special-Use Airspace ..... 3

2. The National Environmental Policy Act (NEPA) ..... 6

3. The National Historic Preservation Act (NHPA) ..... 7

4. Section 4(f) of the Department of Transportation Act ..... 8

B. Factual background ..... 9

1. The temporary flight restriction under 14 C.F.R. § 91.141 when the President is at Mar-a-Lago. ..... 9

2. The full-time flight restriction and associated interim flights procedures in the vicinity of Mar-a-Lago ..... 10

3. The new and updated flight procedures. ..... 11

4. The environmental reviews. 13

5. The petitions for review. 15

SUMMARY OF ARGUMENT 15

STANDARD OF REVIEW 16

ARGUMENT 18

I. The FAA complied with the APA. 18

A. The FAA's order was lawful and rationally explained. 18

1. The FAA complied with § 40103(b)(3)'s requirement to consult with the Secretary of War. 19

2. The FAA satisfied § 40103(b)(3)'s provisions encouraging the maximum civil use of the airspace and restricting aircraft posing security risks that cannot be otherwise addressed. 21

3. The FAA provided a reasoned explanation for its decision, including genuinely engaging with the concerns raised by its own experts. 24

B. The FAA had no obligation to conduct notice and comment on its order restricting flights over Mar-a-Lago. 29

1. Petitioners characterize the § 99.7 instructions as an order and orders are not subject to notice-and-comment rulemaking. 29

2. At a minimum, the good-cause exception applies. 31

3. Petitioners cannot establish prejudice. 33

II. The FAA complied with NEPA. 34

A. The special security instructions required no environmental review. 34

B. The FAA reasonably determined that the flight procedure modifications fall within Categorical Exclusion B-2.5(i). .................. 37

C. No extraordinary circumstances preclude use of a categorical exclusion. .................. 43

III. The FAA complied with the NHPA. .................. 46

IV. The FAA complied with Section 4(f) of the Department of Transportation Act. .................. 51

V. Vacatur would be an inappropriate remedy .................. 54

CONCLUSION .................. 59

## TABLE OF AUTHORITIES*

## CASES

*Adler v. Lewis*,
675 F.2d 1085 (9th Cir. 1982) .......... 8

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
988 F.2d 146 (D.C. Cir. 1993) .......... 54

*Appalachian Power Co. v. EPA*,
249 F.3d 1032 (D.C. Cir. 2001) .......... 41

*Baltimore Gas & Elec. Co. v. NRDC*,
462 U.S. 87 (1983) .......... 17, 41

*Berg v. Kelly*,
897 F.3d 99 (2d Cir. 2018) .......... 24

*Black Oak Energy v. FERC*,
725 F.3d 230 (D.C. Cir. 2013) .......... 55

*Bowman Transp. v. Arkansas-Best Freight Sys.*,
419 U.S. 281 (1974) .......... 22, 27

*Camp v. Pitts*,
411 U.S. 138 (1973) (per curiam) .......... 51

*Center for Biological Diversity v. Salazar*,
706 F.3d 1085 (9th Cir. 2013) .......... 7, 43

*Citizens Against Rails-to-Trails v. STB*,
267 F.3d 1144 (D.C. Cir. 2001) .......... 37

*Citizens to Preserve Overton Park v. Volpe*,
401 U.S. 402 (1971) .......... 16

*City of Alexandria, Va. v. Fed. Highway Admin.*,
756 F.2d 1014 (4th Cir. 1985) .......... 40

*City of Bos. Delegation v. FERC*,
897 F.3d 241 (D.C. Cir. 2018) .......... 27

---

* Authorities upon which we chiefly rely are marked with asterisks.

*City of Dania Beach v. FAA*,
485 F.3d 1181 (D.C. Cir. 2007) .......... 30

*City of Grapevine v. Dep't of Transp.*,
17 F.3d 1502 (D.C. Cir. 1994) .......... 54

*City of Phoenix v. Huerta*,
869 F.3d 963 (D.C. Cir. 2017) .......... 44, 45

*City of Pittsburgh v. Fed. Power Comm'n*,
237 F.2d 741 (D.C. Cir. 1956) .......... 27

*Dep't of Transp. v. Public Citizen*,
541 U.S. 752 (2004) .......... 36, 37

*Earth Island Inst. v. Muldoon*,
82 F.4th 624 (9th Cir. 2023) .......... 42

*Friends of St. Frances Xavier Cabrini Church v. FEMA*,
658 F.3d 460 (5th Cir. 2011) .......... 8, 47, 48

*Fund for Animals v. Frizzell*,
530 F.2d 982 (D.C. Cir. 1975) .......... 44

*Goos v. ICC*,
911 F.2d 1283 (8th Cir. 1990) .......... 37

*Heartland Reg'l Med. Ctr. v. Sebelius*,
566 F.3d 193 (D.C. Cir. 2009) .......... 55

*Hill Dermaceuticals v. FDA*,
709 F.3d 44 (D.C. Cir. 2013) .......... 51

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010) .......... 23, 57

*Jicarilla Apache Nation v. U.S. Dep't of Interior*,
613 F.3d 1112 (D.C. Cir. 2010) .......... 42

**Jifry v. FAA*,
370 F.3d 1174 (D.C. Cir. 2004) .......... 27, 31

*Karst Env't Educ. & Prot. v. EPA*,
475 F.3d 1291 (D.C. Cir. 2007) .......... 16

*Latif v. Obama*,
677 F.3d 1175 (D.C. Cir. 2011) ........................................................................ 57

*Lee v. Garland*,
120 F.4th 880 (D.C. Cir. 2024) ........................................................................ 28

*Logic Tech. Dev. v. U.S. Food & Drug Admin.*,
84 F.4th 537 (3d Cir. 2023) ............................................................................ 26

*Morongo Band of Mission Indians v. FAA*,
161 F.3d 569 (9th Cir. 1998) ............................................................................ 8

*Motor Vehicle Mfrs. Ass'n. v. State Farm Mutual Auto. Ins. Co.*,
463 U.S. 29 (1983) .......................................................................................... 17

*N. Air Cargo v. U.S. Postal Serv.*,
674 F.3d 852 (D.C. Cir. 2012) ........................................................................ 59

*Narragansett Indian Tribe v. Warwick Sewer Auth.*,
334 F.3d 161 (1st Cir. 2003) ....................................................................... 7, 49

*Nat'l Audubon Soc'y v. Hester*,
801 F.2d 405 (D.C. Cir. 1986) ........................................................................ 36

*Nat'l Mining Ass'n v. Fowler*,
324 F.3d 752 (D.C. Cir. 2003) .......................................................................... 7

*Navy v. Egan*,
484 U.S. 518 (1988) ................................................................................... 23, 57

*Nevada v. Dep't of Energy*,
457 F.3d 78 (D.C. Cir. 2006) .......................................................................... 35

*North Carolina v. FAA*,
957 F.2d 1125 (4th Cir. 1992) ........................................................................ 30

*PDK Labs. Inc. v. DEA*,
362 F.3d 786 (D.C. Cir. 2004) ........................................................................ 33

*Protect Our Parks, Inc. v. Buttigieg*,
39 F.4th 389 (7th Cir. 2022) ............................................................................ 44

*Public Citizen, Inc. v. FAA*,
988 F.2d 186 (D.C. Cir. 1993) ........................................................................ 17

*Roy v. United States*,
416 F.2d 874 (9th Cir. 1969) .......................................................................... 23-24

*Safe Extensions, Inc. v. FAA*,
509 F.3d 593 (D.C. Cir. 2007) .......................................................................... 30

*Save Our Heritage, Inc. v. FAA*,
269 F.3d 49 (1st Cir. 2001) .......................................................................... 49-50

*Save the Sound, Inc. v. FAA*,
2026 WL 2093931 (D.C. Cir. July 21, 2026) .................................................. 35

*Schneider v. Kissinger*,
412 F.3d 190 (D.C. Cir. 2005) .................................................................... 28, 57

**Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
605 U.S. 168 (2025) .......................................... 6, 17, 35, 37, 40, 45, 49, 50, 55

*Sierra Club v. FERC*,
153 F.4th 1295 (D.C. Cir. 2025) ........................................................ 17, 43, 56

*Sugar Cane Growers Coop. of Fla. v. Veneman*,
289 F.3d 89 (D.C. Cir. 2002) .......................................................................... 59

*Town of Cave Creek v. FAA*,
325 F.3d 320 (D.C. Cir. 2003) .......................................................................... 44

*Trump v. Hawaii*,
585 U.S. 667 (2018) .......................................................................... 24

*Vt. Yankee Nuclear Power Corp. v. NRDC*,
435 U.S. 519 (1978) .......................................................................... 20

*Watts v. United States*,
394 U.S. 705 (1969) .......................................................................... 56

*Wood v. Moss*,
572 U.S. 744 (2014) .......................................................................... 56

**STATUTES**

*Administrative Procedure Act*

5 U.S.C. § 553 .......................................................................... 29, 31

5 U.S.C. § 706 .......... 17, 33, 35

*Powers, Authorities, and Duties of United States Secret Service*

18 U.S.C. § 3056 .......... 18, 20, 28

18 U.S.C. § 3056A .......... 18, 20

*National Environmental Policy Act*

42 U.S.C. § 4332 .......... 6

42 U.S.C. § 4336 .......... 6

42 U.S.C. § 4336e .......... 7

*Department of Transportation Act*

49 U.S.C. § 303 .......... 8, 53

*Federal Aviation Act*

49 U.S.C. § 40103 .......... 3, 4, 18, 19, 20, 21, 22, 28, 30

49 U.S.C. § 46110 .......... 2, 29, 51

49 U.S.C. § 44701 .......... 4, 18

*National Historic Preservation Act*

54 U.S.C. § 306108 .......... 7, 48

## REGULATIONS

14 C.F.R. § 91.141 .......... 9, 11

14 C.F.R. § 99.7 .......... 4, 5, 6, 10, 15-16, 20, 29, 30, 31, 32, 37

14 C.F.R. § 91.103 .......... 5

23 C.F.R. § 774.3 .......... 53

36 C.F.R. § 800.4 .......... 47

36 C.F.R. § 800.5 .......... 8, 48, 49

36 C.F.R. § 800.11 .......... 47

36 C.F.R. § 800.12 .......... 49

90 Fed. Reg. 57,353 (Dec. 11, 2025) .......... 11

91 Fed Reg. 23,187-01 (Apr. 30, 2026) .............................................................. 10
91 Fed Reg. 48,255 (July 31, 2026) .................................................................. 10, 36

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| FAA | Federal Aviation Administration |
| NEPA | National Environmental Policy Act |
| NHPA | National Historic Preservation Act |
| TSA | Transportation Security Administration |

## INTRODUCTION

The safety of our Chief Executive is crucial to national stability. When the Secret Service identified threats to the President at his Mar-a-Lago residence and determined that restricting operations in the airspace above it at all times, regardless of his presence, was a "critical layer" of his protection, the Federal Aviation Administration (FAA) acted decisively. The FAA restricted most aircraft operations within one nautical mile of Mar-a-Lago and then modified existing air traffic procedures at President Donald J. Trump International Airport (then, Palm Beach International Airport) to route traffic around the flight restriction.

Petitioners now ask this Court to undo that protection based on noise and procedural grievances against the FAA that are lacking in merit and wholly insufficient to override the Nation's interest in protecting its President. Their theory is that the FAA was required to publish notice in the *Federal Register* and invite public comment before acting on adverse threat intelligence. They also posit that rigorous noise screening, state historic preservation concurrence, and a documented categorical exclusion somehow constitute environmental evasion rather than compliance. They incomprehensibly allege that decibel increases over pre-existing flight paths that fall well below established significance thresholds are grounds to vacate a security measure that the Secret Service deemed critical.

Petitioners' contentions should be rejected. The FAA consulted with the Department of War, the State Historic Preservation Office, and others, and independently established the restriction's parameters. The agency completed a comprehensive environmental review before the enduring procedures took effect. Petitioners mistake procedural speed for procedural failure, policy disagreement over the President's protection for arbitrary action, and N-I-M-B-Y noise concerns for legal violations.

As their request for vacatur proves, Petitioners' real objection is to the Secret Service's decision to protect the President, his family, and his residence from threats at all times. That objection is not cognizable here. The Secret Service's threat assessment is unrebutted, its protective judgment is entitled to deference, and this Court is in no position to discount it. The petitions should be denied.

## STATEMENT OF JURISDICTION

This Court has exclusive subject-matter jurisdiction to review FAA final orders. 49 U.S.C. § 46110(a). The challenged actions are FAA final orders.

The FAA issued special security instructions via a Notice to Airmen, on October 20, 2025, and Petitioners timely petitioned for review 53 days later, on December 12, 2025. Nos. 25-1282, 25-1283. *See* 49 U.S.C. § 46110(a) (petition "must be filed not later than 60 days after the order is issued").

The FAA issued the Departure Procedures and Instrument Approach Procedures on January 22, 2026, and Petitioners timely petitioned for review 22 days later, on February 13, 2026. Nos. 26-1034, 26-1035.

## STATEMENT OF THE ISSUES

I. Were the FAA's special flight restrictions near the President's residence, requested by the Secret Service for security reasons, arbitrary or capricious under the Administrative Procedure Act (APA)?

II. Did the FAA comply with National Environmental Policy Act (NEPA), the National Historic Preservation Act (NHPA), and Section 4(f) of the Department of Transportation Act in approving modified flight procedures?

III. If the FAA erred, should the Court remand without vacatur given the safety and security risks of vacating the orders?

## PERTINENT STATUTES AND REGULATIONS

Except for those contained in the attached addendum, pertinent statutes and regulations are contained in the Statutory Addendum to Joint Petitioners' Brief.

## STATEMENT OF THE CASE

### A. Statutory and regulatory background

#### 1. National Airspace System: Special Security Instructions versus Special-Use Airspace

Congress has vested the federal government with exclusive authority over the Nation's airspace. 49 U.S.C. § 40103(a)(1). Under 49 U.S.C. § 40103(b)(1), the

FAA "shall develop plans and policy for the use of the navigable airspace" and "assign by regulation or order the use of the airspace necessary to ensure the safety of aircraft and the efficient use of airspace." That authority includes the power to restrict or prohibit flight operations when necessary to address safety, security, or national defense concerns. *See* 49 U.S.C. §§ 40103(b)(3), 44701(a)(5).

Pursuant to this statutory mandate, the FAA has promulgated regulations governing the designation and control of special-use airspace and the imposition of flight restrictions. Among these authorities, 14 C.F.R. § 99.7 provides a flexible mechanism for the FAA, in coordination with national security and law enforcement agencies like the Secret Service, to impose temporary flight restrictions or other limitations on aircraft operations in defined areas of airspace. Specifically, § 99.7 authorizes the FAA to "issue special security instructions in the interest of national security," including by regulating or prohibiting flight within designated areas when necessary to address emergent risks.

In practice, special security instructions under § 99.7 are implemented through operational orders known as Notices to Airmen, which provide real-time, operationally binding instructions to airspace users. These Notices identify the geographic scope, altitude limitations, duration, and operational requirements associated with the restriction. Pilots and operators are required to comply with

such instructions as a condition of lawful operation in the National Airspace System. *See* 14 C.F.R. §§ 91.103, 91.137-91.145.

Section 99.7 operates alongside other regulatory provisions authorizing specific categories of flight restrictions, including those for disaster or hazard areas (§ 91.137), national disaster relief (§ 91.138), the movement of the President of the United States and other designated officials (§ 91.141), space flight operations (§ 91.143), and sporting events (§ 99.145). Unlike those more particularized provisions, § 99.7 provides a broad, security-based authority that is not limited to predefined categories of events, allowing the FAA to respond rapidly to evolving threats or sensitive operations.

Special security instructions and other flight restrictions differ from formal designations of regulatory special-use airspace. Such designations are fixed airspace classifications established through formal regulatory procedures and depicted on aeronautical charts. *See* 14 C.F.R. Part 73. They are generally intended to provide enduring protection for sensitive governmental, military, or national-security interests. By contrast, special security instructions under § 99.7 do not create a new, enduring airspace classification. Instead, they impose time-limited operational restrictions on aircraft through an order (Notice to Airmen), allowing the FAA to respond quickly and flexibly to evolving security concerns without

undertaking the more formal process associated with establishing or modifying special-use airspace.

The distinction is reflected in the FAA's historical practice. When the agency has sought to provide permanent protection in the interest of national security, it has established special-use airspace called prohibited areas. For example, the FAA has maintained prohibited areas over the residences of former wartime Presidents George H.W. Bush in Kennebunkport, Maine, and George W. Bush near Crawford, Texas, even after they left office. AR 53. By contrast, § 99.7 has been used to impose temporary, operationally tailored restrictions in response to specific security needs, threats, or events.

### 2. The National Environmental Policy Act (NEPA)

NEPA, 42 U.S.C. § 4321 *et seq*., requires federal agencies to consider the environmental impacts of their proposed actions, but it establishes only a procedural framework rather than mandating substantive outcomes. *See Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 177 (2025). NEPA compliance may take three forms: (1) preparation of an environmental impact statement, 42 U.S.C. § 4332(2)(C); (2) preparation of an environmental assessment and finding of no significant impact, *id.* § 4336(b)(2); or (3) application of a categorical exclusion, *id.* § 4336(a)(2).

A categorical exclusion applies to categories of actions that the agency has previously determined do not individually or cumulatively have a significant effect on the human environment. *See FAA National Environmental Policy Act Implementing Procedures*, FAA Order 1050.1G § 1.4(b)(1) (AR 4743); 42 U.S.C. § 4336e(1). Where a proposed action falls within a categorical exclusion and no extraordinary circumstances are present, the agency need not prepare further environmental analysis, and its NEPA obligations are satisfied. *Id.* § 1.4(f)(1) (AR 4744). *See Center for Biological Diversity v. Salazar*, 706 F.3d 1085, 1096 (9th Cir. 2013) (*CBD*) ("Application of a categorical exclusion is not an exemption from NEPA; rather, it is a form of NEPA compliance.").

### 3. The National Historic Preservation Act (NHPA)

Section 106 of the NHPA, 54 U.S.C. § 306108, requires federal agencies to "take into account the effect of the[ir] undertaking[s]" on historic properties. Like NEPA, the NHPA is a purely procedural statute. *Nat'l Mining Ass'n v. Fowler*, 324 F.3d 752, 755 (D.C. Cir. 2003). "Section 106 is characterized aptly as a requirement that agency decisionmakers 'stop, look, and listen,' but not that they reach particular outcomes." *Narragansett Indian Tribe v. Warwick Sewer Auth.*, 334 F.3d 161, 166 (1st Cir. 2003) (internal citations omitted). Where an agency determines that an "undertaking" will have no effect on historic properties and the State Historic Preservation Office concurs, the agency's Section 106 obligations

are satisfied without the need for further consultation or mitigation. *See Friends of St. Frances Xavier Cabrini Church v. FEMA*, 658 F.3d 460, 463 (5th Cir. 2011). In such circumstances, the statute's purely procedural requirements are fulfilled, and the agency may proceed with the undertaking. 36 C.F.R. § 800.5(c) & (d)(1).

#### 4. Section 4(f) of the Department of Transportation Act

Section 4(f) of the Department of Transportation Act, 49 U.S.C. § 303, applies only where a transportation project "uses" protected resources such as publicly owned parks, recreation areas, wildlife refuges, or historic sites. In the context of airspace actions, there is no "use" within the meaning of the statute where the project does not involve any physical occupancy or incorporation of a Section 4(f) property. *See Morongo Band of Mission Indians v. FAA*, 161 F.3d 569, 583 (9th Cir. 1998); AR 2002 ("Air traffic actions do not result in any physical use of properties."). Nor is there a "constructive use" where the action does not result in a substantial impairment of the protected resource's activities, features, or attributes; in particular, where noise analysis demonstrates no significant increase in noise over such properties, the agency may reasonably conclude that no constructive use occurs. AR 2290-91, 3164-65. Where there is neither actual use nor constructive use, Section 4(f) does not impose further procedural or substantive requirements, and the agency may proceed without preparing a Section 4(f) evaluation. *See Adler v. Lewis*, 675 F.2d 1085, 1091 (9th Cir. 1982) ("The labeling

of property as ‘used’ or ‘not used’ is the prerequisite to further examination and to compliance with the provisions of § 4(f).”).

### B. Factual background

The Mar-a-Lago Club in Palm Beach, Florida is a residence and the domicile of the President of the United States. It sits on a narrow barrier island, stretching from the Atlantic Ocean on the east to Lake Worth Lagoon on the west, fitting the meaning of its name: “Sea-to-Lake.” It is also located 2.4 nautical miles southeast of the main runway at President Donald J. Trump International Airport (the Airport). AR 468.

#### 1. The temporary flight restriction under 14 C.F.R. § 91.141 when the President is at Mar-a-Lago.

During the President’s first term, the FAA established a temporary flight restriction under 14 C.F.R. § 91.141 in the vicinity of Mar-a-Lago when the President and certain other parties were to visit the residence. AR 1999. The temporary flight restriction imposed a 10-nautical mile “inner core” that restricts drones and most aviation, with an outer 30-nautical mile ring requiring specific, approved flight procedures. AR 244-26. At the Secret Service’s request, for the President’s second term, the FAA established this temporary flight restriction when the President or certain others were to visit or be in the vicinity of Mar-a-Lago. AR 1999.

### 2. The full-time flight restriction and associated interim flights procedures in the vicinity of Mar-a-Lago.

On September 16, 2025, the Secret Service requested that the FAA establish a permanent flight restriction within one nautical mile of Mar-a-Lago from the surface to 1,000 feet above ground level "to ensure the safety and security" of the President. AR 2005. In the same request, the Secret Service sought a full-time flight restriction over and around Trump Tower in New York City. *Id.*[2] As full-time restrictions, the restrictions apply even when the President is not present. AR 345, 1999. The Secret Service requested the full-time flight restrictions "due to adverse threat intelligence," including "terroristic threats." AR 345, 1999. In the Secret Service's view, a full-time restriction would "serve as a critical layer in our protective security posture." AR 1999.

On October 18, 2025, the FAA issued special security instructions via Notice to Airmen FDC 5/2809, implementing a temporary full-time flight restriction under 14 C.F.R. § 99.7 while the FAA considered the permanent measure requested by the Secret Service. AR 233. That order, effective for one year from October 20, 2025, restricted certain aircraft operations within one nautical mile of Mar-a-Lago from the surface to 2,000 feet above ground level. AR

---

[2] In April 2026, the FAA proposed a rule designating special-use airspace near Trump Tower. 91 Fed Reg. 23187-01 (Apr. 30, 2026). The rule is now final. 91 Fed. Reg. 48255 (July 31, 2026). No such proposal has been made for Mar-a-Lago.

233-34.[3] But the FAA excepted aircraft on published instrument procedures such as commercial aircraft so long as the aircraft does not enter a more restrictive 0.5 nautical mile inner ring. AR 2010. In addition, on October 20, 2025, the FAA issued interim air-traffic procedures intended to route air traffic around the restricted area. AR 493-95. The geographically broader flight restriction under 14 C.F.R. § 91.141 is in effect when the President is at Mar-a-Lago or in town.

### 3. The new and updated flight procedures.

On December 11, 2025, the FAA published a rule in the *Federal Register* that included air-traffic procedure changes at the Airport that would become effective on January 22, 2026. AR 533-34; 90 Fed. Reg. 57,353 (Dec. 11, 2025). To ensure compliance with the full-time flight restriction, the FAA modified existing instrument procedures to ensure that their centerlines do not penetrate the 0.5 nautical mile exclusion zone, while still allowing limited access within the outer one nautical mile ring for aircraft on published procedures like commercial aircraft. AR 2010, 2032.

Consistent with these constraints, the FAA has reintroduced the RNAV (GPS) X RWY 28R and RNAV (RNP) W RWY 28R procedures previously used during earlier temporary flight restrictions during the President's first term, from

[3] The flight restriction is not "permanent," as Petitioners repeatedly assert. The special security instructions expire in one year absent renewal. AR 233, 328.

2017 to 2021, reflecting their continued operational utility during presidential residence periods. RNAV, or "area navigation," refers to GPS-based approach and departure procedures that let aircraft fly precise, computer-guided paths rather than relying solely on ground-based radio beacons.

In addition, the FAA amended multiple RNAV Standard Instrument Departures, along with the Palm Beach Five Departure, to ensure their flight tracks remain outside the protected inner ring. Standard Instrument Departures are pre-planned, GPS-guided takeoff routes that pilots follow to safely and predictably exit an airport's airspace, each identified by a five-letter code name such as MIXAE, SLIDZ, TBIRD, WELLY, and OLAKE. A new, limited-use AHABB Departure, using RNAV, was developed primarily for small propeller aircraft with minimal expected usage. AR 2020-21.

The FAA has also updated Obstacle Departure Procedures to align with revised climb and routing requirements under the constrained airspace. These procedures are routes designed to help aircraft climb safely away from nearby terrain or obstacles. AR 2022. And finally, approach procedures to Runway 10L have been modified. AR 2023-25. These changes collectively reflect a broader effort to maintain safe and efficient operations while accommodating full-time national security-related airspace constraints over Mar-a-Lago. Except for AHABB, none of the instrument procedures are new.

On January 22, 2026, the FAA issued the new and amended instrument procedures superseding nearly all the interim procedures from October 2025. AR 783, 926, 1047-48, 1126, 1268-69, 1695-97, 1796, 1902, 1903.[4]

### 4. The environmental reviews.

Before the updated air-traffic procedures took effect, the FAA documented its findings that its proposed action qualifies for categorical exclusion under NEPA and otherwise complies with environmental laws. AR 1999-2053.

Relying on FAA NEPA Order 1050.1G, the FAA concluded that the action fits within a category for modifications to existing flight procedures below 3,000 feet that do not significantly increase noise over noise-sensitive areas. AR 2000 (Categorical Exclusion B-2.5(i)). It also found that the newly created AHABB procedure fits within a separate category of actions that "do not cause traffic to be routinely routed over noise-sensitive areas." AR 1999-2000. Environmental screening using FAA-approved tools showed no significant noise increases, though some reportable increases would occur northeast of the airport and decreases to the east. AR 2000-01, 2028-47. Because the action involved only procedural airspace changes and no ground disturbance, construction, or land use changes, the FAA found negligible or no impacts across a wide range of environmental resource

[4] Some of the October procedures were also amended in December 2025. AR 919, 1037, 1264, 1671, 1790, 1888, 1979.

categories, including water resources, coastal zones, socioeconomics, and hazardous materials. AR 2000-02. Air quality impacts were likewise determined to be de minimis and consistent with applicable implementation plans. AR 2001. On this basis, the FAA concluded that no further NEPA review was required and that no extraordinary circumstances were present. AR 2002.

With respect to the NHPA, the FAA consulted with the Florida State Historic Preservation Office on its determination that the action would result in "no adverse effects" on historic properties. AR 2001. The FAA reasoned that the identified resources were architectural in nature and that any non-significant noise changes would not impair their qualifying characteristics; the State concurred with this determination. AR 2001, 2049-53.

Under Section 4(f) of the Department of Transportation Act, the FAA found no actual or constructive use of protected properties. The agency explained that there would be no significant noise increases and noted the purely procedural nature of the action. AR 2002.

Overall, the FAA concluded that the airspace changes would not materially affect historic, cultural, or protected recreational resources, reinforcing its determination that its action qualifies for a categorical exclusion and does not require further environmental analysis. AR 2000-02.

### 5. The petitions for review.

Petitioners filed their first duo of petitions for review on December 12, 2025 (Nos. 25-1282, 25-1283), challenging the October 2025 flight restriction and associated interim air-traffic procedures. On February 12, 2026, Petitioners filed their second duo of petitions (Nos. 26-1034, 26-1035), challenging the January 22, 2026, new and updated procedures that replaced the interim air-traffic procedures that mostly no longer exist. Petitioners allege that the FAA's actions violated the APA, NEPA, the NHPA, and Section 4(f). Petitioners seek to vacate the FAA orders. Pet. Br. 74.

## SUMMARY OF ARGUMENT

The petitions should be denied. The FAA's decision to implement a full-time flight restriction for one year over the President's residence at the request of the Secret Service, and to redesign the Airport's instrument procedures to comply with that restriction, was a lawful, reasonable, and procedurally proper exercise of the agency's broad authority over the Nation's airspace. The FAA permissibly relied on the Secret Service's expert judgment, while independently analyzing operational impacts and confining the restriction to a one-nautical-mile radius. The APA requires nothing more. Nor does the APA require the FAA to conduct notice-and-comment rulemaking because such rulemaking applies only to "rules" and Petitioners have conceded that the temporary flight restriction under 14 C.F.R.

§ 99.7 is an FAA "order." At a minimum, the APA's good-cause exception excuses advance public comment on the temporary flight restrictions.

The FAA also complied with NEPA, the NHPA, and Section 4(f). A rigorous, FAA-approved noise screening analysis confirmed that the procedure changes would cause no significant noise increases, supporting application of Categorical Exclusion B-2.5(i). No extraordinary circumstances were present because public opposition to the underlying security policy is not technical controversy over environmental impacts. The State Historic Preservation Officer concurred in the FAA's finding of no adverse effect on historic properties, and no actual or constructive use of Section 4(f) resources occurred.

Finally, even if the Court were to find procedural error, both the President's security and aviation safety and efficiency compel remand without vacatur.

## STANDARD OF REVIEW

In reviewing final orders of the FAA for compliance with NEPA, the NHPA, and Section 4(f) of the Department of Transportation Act, courts use the standard of review established in the APA. *See Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410-11 (1971) (Section 4(f)); *Karst Env't Educ. & Prot. v. EPA*, 475 F.3d 1291, 1295 (D.C. Cir. 2007) (NEPA and NHPA).

Under the APA, a court may set aside agency action only if the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law." 5 U.S.C. § 706(2)(A). This is a "narrow" standard under which a court asks only whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made. *See Motor Vehicle Mfrs. Ass'n. v. State Farm Mutual Auto. Ins. Co*., 463 U.S. 29, 43 (1983). Review is at its most deferential where the agency's decision rests on technical expertise and predictive judgments. *See Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983). This is especially true in matters involving scientific or technical determinations such as air-traffic operations and aviation and presidential safety, areas where "a reviewing court must generally be at its most deferential." *Id.*; *see also Public Citizen v. FAA*, 988 F.2d 186, 196 (D.C. Cir. 1993).

That deference extends to an agency's determination of the nature and extent of procedural analysis required under statutes such as NEPA, the NHPA, and threshold determinations under Section 4(f). *See Sierra Club v. FERC*, 153 F.4th 1295, 1302 (D.C. Cir. 2025) ("The bedrock principle of judicial review in NEPA cases can be stated in a word: Deference.") (quoting *Seven Cnty.*, 605 U.S. at 185)). As the Supreme Court recently underscored in *Seven County*, courts must not "micromanage" the scope of agency procedural analysis so long as it falls "within a broad zone of reasonableness." *Seven Cnty*., 605 U.S. at 183.

## ARGUMENT

### I. The FAA complied with the APA.

#### A. The FAA's order was lawful and rationally explained.

The FAA's decision to impose a continuous time-limited airspace restriction over the President's residence is a lawful, carefully calibrated, and institutionally appropriate exercise of its statutory authority. Congress granted the FAA broad power to restrict the use of the airspace in the interest of national security, 49 U.S.C. §§ 40103(b)(1), (3), 44701(a)(5), and charged the Secret Service with protecting the President, his family, and his residences, 18 U.S.C. §§ 3056, 3056A. The restriction here is the product of those two mandates working together as Congress designed them to. The FAA consulted with the Department of War (AR 185-87), received and evaluated a protective determination from the Secret Service (AR 2005), negotiated the parameters of the restriction to minimize the impact on civil aviation (AR 557), and independently calibrated the restrictions' scope in ways that departed from what the Secret Service initially requested (AR 159-60). The result is a narrowly drawn one-nautical-mile buffer over Mar-a-Lago that leaves most of the surrounding airspace open, distinguishes between general aircraft and aircraft flying on instrument procedures such as commercial aircraft, and reflects the FAA's own technical judgment about air-traffic operations and

aviation safety. The agency acted reasonably, and its actions easily satisfy deferential arbitrary-or-capricious review under the APA.

Petitioners' arguments that the FAA violated 49 U.S.C. § 40103 or had no reasoned basis for issuing its special security instructions lack merit.

#### 1. The FAA complied with § 40103(b)(3)'s requirement to consult with the Secretary of War.

Petitioners first argue that the FAA violated 49 U.S.C. § 40103(b)(3) by failing to consult with the Secretary of War before issuing the special security instructions. Pet. Br. 32-33. The record refutes that contention directly.

Section 40103(b)(3) states that the FAA shall "consult with" the Secretary of War while establishing flight restrictions for national security purposes. The statute does not require a formal sign-off, a documented response from the Secretary personally, or independent verification of the military's concurrence. It requires consultation, meaning that the relevant national defense interests are brought to bear before the decision is made. That requirement was met here. The record reflects that the FAA held meetings with Department of War representatives in connection with the special security instructions. AR 184-87. Those meetings are precisely what the consultation requirement contemplates. They provide an opportunity for defense interests to be raised and considered before the restriction issues. The FAA thus complied with this provision.

The broader statutory and regulatory framework reinforces this conclusion. The authority the FAA exercised here flows from 14 C.F.R. § 99.7, which authorizes special security instructions at the request of any "federal security or intelligence agency." That formulation reflects the recognition that the range of agencies with legitimate national security equities over airspace is broader than the Department of War alone. In this case, the Secret Service, the federal agency with primary statutory responsibility for protecting the President, his family, and his residences, 18 U.S.C. §§ 3056, 3056A, initiated the request and supplied the security rationale. AR 2005. The Secret Service is exactly the kind of federal security agency whose protective judgment § 99.7 is designed to implement. Reading § 40103(b)(3)'s consultation requirement to demand something beyond the FAA's documented engagement with Department of War representatives and its implementation of a Secret Service protective determination improperly would impose procedural obligations the statute does not contain. *See Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 549 (1978) (courts cannot impose on an agency procedures not found in a statute or regulation). The FAA thus consulted the appropriate security agencies before acting.

### 2. The FAA satisfied § 40103(b)(3)'s provisions encouraging the maximum civil use of the airspace and restricting aircraft posing security risks that cannot be otherwise addressed.

Petitioners next argue that the FAA violated § 40103(b)(3) provisions encouraging the FAA to preserve "maximum use of the navigable airspace by civil aircraft consistent with national security" and authorizing the FAA to restrict aircraft it "cannot identify, locate, and control." Pet. Br. 33-34. Again, Petitioners' arguments misread the statutory text and ignore the record.

The maximum-civil-use language does not prohibit airspace restrictions. It instead directs the FAA to preserve as much civil aviation access as national security permits. The FAA did exactly that here. It established the restriction within a one-nautical-mile radius around Mar-a-Lago as requested but structured the restriction so that aircraft operating on published instrument procedures—including scheduled commercial air carriers—could continue to operate within the outer portion of the restricted area so long as they remained outside the 0.5 nautical-mile inner core. AR 157-67, 180-83; 2010. The FAA then redesigned instrument procedures to facilitate those continued operations. A restriction that preserves commercial access to the Airport and leaves most of the surrounding airspace available for civil use is the very definition of maximizing civil use consistent with national security.

Petitioners' contention that the FAA should have created an even broader commercial-carrier exemption therefore misses the mark. Pet. Br. 38. The FAA already crafted an accommodation for aircraft flying published procedures, including commercial aircraft, while concluding that no aircraft should be permitted to penetrate the innermost half-mile security buffer. AR 2010. The agency reasonably determined that a complete exemption for commercial traffic within that core would be unresponsive to the Secret Service's request, as the security interest required uniform application and a partial exemption would undermine the protective buffer entirely. An agency need not write an exhaustive defense of every option it considered and rejected. Instead, it need only have a path that may reasonably be discerned from the record. *See Bowman Transp. v. Arkansas-Best Freight Sys.*, 419 U.S. 281, 286 (1974). That path is clear here.

The identify-locate-control argument fares no better. Petitioners read § 40103(b)(3)(B) as prohibiting the FAA from restricting any aircraft it can track on radar. That reading would effectively nullify prophylactic airspace security restrictions altogether, since the FAA can identify and track virtually any aircraft in the National Airspace System. The statute cannot bear that construction. The identify-locate-control provision is best understood as requiring the FAA to avoid unnecessary restrictions on aircraft that pose no conceivable security concern, not as prohibiting security buffers around sensitive sites simply because

the aircraft within them can be tracked. A fixed residential site presents an inherently different threat calculus than open airspace. Even a fully identified and tracked aircraft can pose an unacceptable risk if it is permitted to fly directly over the President's residence, because tracking does not equate to the ability to intercept in time. The FAA's implementation of the Secret Service's security judgment that a one-nautical-mile buffer is necessary despite radar coverage of the area is owed deference. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-35 (2010) (courts owe deference to the political branches' "informed judgment" on national security, which often turns on "predictive judgment[s]" rather than hard proof); *Navy v. Egan*, 484 U.S. 518, 529 (1988) (predictive security judgments are committed to the expertise of the responsible agency).

Petitioners also question why the restriction applies when the President is not physically present at Mar-a-Lago. Pet. Br. 35. That answer lies with the Secret Service, an agency whose record Petitioners have chosen not to put before this Court. But common sense dictates that at least part of the answer lies in the nature of prophylactic security and the significance of the presidency. The President's permanent residence is a known, fixed, and symbolically significant location. *See Berg v. Kelly*, 897 F.3d 99, 114 (2d Cir. 2018) (injury to the President threatens "the stability of the nation" and "the democratic ideals that guide our system of government"); *Roy v. United States*, 416 F.2d 874, 877 (9th Cir. 1969) (noting the

national and international implications of presidential security threats). For such a high-profile and symbolic target, it is unlikely that hostile actors will confine their activities to windows of presidential presence as pre-positioning, reconnaissance, and surveillance can occur at any time. Family members or other protectees too could be targeted, even when the President is not in residence. Moreover, at the altitudes and distances involved, prevention is the only reliable safeguard, because each second matters once an incursion is underway. The imposition of continuous restrictions over former Presidents Bushs' residences confirms that this judgment is not novel. AR 53. *Cf. Trump v. Hawaii*, 585 U.S. 667, 686 (2018) (courts do not demand that the Executive "conclusively link all of the pieces in the puzzle" before crediting national security judgments).

**3. The FAA provided a reasoned explanation for its decision, including genuinely engaging with the concerns raised by its own experts.**

Petitioners' remaining argument is that the FAA's only explanation for the restriction was that the Secret Service requested it, and that it ignored the warnings of the FAA Air Traffic Organization's Chief Operating Officer in the process. Pet. Br. 35-39. Both contentions mistake the record and the law.

The record shows extended internal deliberation about the appropriate scope of the restriction, active negotiation with the Secret Service over its parameters, and independent FAA judgments that departed from what the Secret Service

initially sought. The FAA's internal communications describe the process as a "negotiation" with the Secret Service, AR 557, and explicitly recognized that "[t]he Secret Service is not responsible for moving traffic flows," AR 736. These statements prove that the FAA was exercising its own air traffic expertise throughout, not blindly deferring to the Secret Service.

One example of the FAA's independent judgment is the treatment of commercial and instrument traffic. The Secret Service requested a one-nautical-mile restriction based on protective concerns. But the FAA determined in coordination with the Secret Service that aircraft operating on published instrument procedures—including commercial air carriers—could safely continue to use portions of that airspace outside a more restrictive 0.5 nautical-mile inner core. AR 2010. That accommodation required the FAA to assess flight paths, traffic flows, instrument procedures, and safety implications that lie squarely within its own expertise. The FAA likewise exercised independent judgment in setting the restriction's altitude. Although the Secret Service requested a restriction at 1,000 feet, the FAA imposed it at 2,000 feet, concluding that the higher altitude provided materially better response time without materially increasing the number of affected operations. AR 159-60. By independently calibrating both the lateral and vertical dimensions of the restriction to balance security needs against efficient

movement of air traffic, the FAA was exercising its own statutory responsibilities and technical judgment, not merely ratifying the Secret Service's request.

Petitioners' reliance on the Chief of the FAA Air Traffic Organization's warnings does not change this picture. Pet. Br. 37-39. The Chief Operating Officer's memorandum to the Administrator detailed anticipated operational impacts and proposed modifications to reduce them. AR 180-83. The FAA did not disregard those concerns. The one-nautical-mile radius with a 0.5 nautical mile variance for aircraft flying on instrument procedures reflects the minimum geographic footprint the Secret Service's protective requirements demanded. The 2,000-foot ceiling was selected specifically because the FAA's own data showed it would not materially increase the number of affected operations beyond what a 1,000-foot restriction would have caused. AR 159-60. The fact that the FAA did not adopt every recommendation in the Chief Operating Officer's memorandum does not mean it ignored that memorandum. Rather, the Chief Operating Officer's concerns were heard, weighed against the Secret Service's security determination, and addressed through the calibration of the restriction's parameters. That is the definition of reasoned decisionmaking. *See Logic Tech. Dev. v. U.S. Food & Drug Admin.*, 84 F.4th 537, 553 (3d Cir. 2023) ("Reasoned disagreement among civil servants is the stuff of good government, not APA violations.").

As a matter of law, the FAA was also entitled to rely on the Secret Service's expert protective judgment. This Court established that principle in *Jifry v. FAA*, 370 F.3d 1174 (D.C. Cir. 2004), where it upheld the FAA's revocation of pilot licenses based on Transportation Security Administration (TSA) threat determinations without requiring the FAA to independently substantiate the TSA's underlying security judgments. 370 F.3d at 1182-84. Just as the FAA there was not required to re-derive TSA's threat assessments, it was not required to conduct an independent security analysis to verify the Secret Service's determination here.

The APA requires the FAA to rationally implement the Secret Service's expert security judgments within its own domain of air traffic safety, not to second-guess them. *See City of Bos. Delegation v. FERC*, 897 F.3d 241, 255 (D.C. Cir. 2018) (citing *City of Pittsburgh v. Fed. Power Comm'n*, 237 F.2d 741, 754 (D.C. Cir. 1956)). The adequacy of the FAA's explanation is measured by the full administrative record, which includes the FAA's own analysis of operational implications, its internal deliberations about scope and parameters, its independent judgment on the parameters of the restriction, and the broader body of knowledge about presidential security that informed the Secret Service's determination. *See Bowman Transp.*, 419 U.S. at 286. That record makes the FAA's path plain.

That the FAA's path is plain follows directly from the statutory structure Congress established. Congress assigned responsibility for the President's

protection to the Secret Service, 18 U.S.C. § 3056, and responsibility for airspace management to the FAA, 49 U.S.C. § 40103. When the Secret Service determines that a protective measure is necessary and requests the FAA's assistance, those two statutory mandates operate together. The FAA's role is not to second-guess whether the Secret Service's protective assessment is correct. It is to implement that assessment in a manner consistent with safe and efficient airspace management. That is what the FAA does every day and what it did here.

Petitioners' objections are ultimately directed at the Secret Service's protective determination, not at any failure of the FAA's process. Courts are ill-suited to second-guess whether the Secret Service correctly assessed the threat to the President's residence. *See Schneider v. Kissinger*, 412 F.3d 190, 196 (D.C. Cir. 2005) ("Unlike the executive, the judiciary has no covert agents, no intelligence sources, and no policy advisors. The courts are therefore ill-suited to displace the political branches in such decision-making."); *Lee v. Garland*, 120 F.4th 880, 889-91 (D.C. Cir. 2024). Here, the Secret Service decided that the airspace over Mar-a-Lago must be restricted to enhance the protection of the President and his family and, correspondingly, the Nation, and the FAA rationally implemented that decision within its own domain. The APA requires nothing more.

### B. The FAA had no obligation to conduct notice and comment on its order restricting flights over Mar-a-Lago.

Petitioners contend that the FAA could not act on the Secret Service's threat assessment until the FAA published notice in the *Federal Register*, allowed public comment for at least 45 days, and then responded to each comment in writing. Pet. Br. 29-32. That contention fails for three independent reasons.

#### 1. Petitioners characterize the § 99.7 instructions as an order and orders are not subject to notice-and-comment rulemaking.

*First*, Petitioners' notice-and-comment challenge collapses under the weight of their own jurisdictional pleading. To invoke this Court's jurisdiction, Petitioners were required to characterize each of the twenty-four challenged actions as a "final order" under 49 U.S.C. § 46110(a), which extends review to FAA "order[s]." They did exactly that. Pet. Br. 1. Having secured the right to be heard in this Court by characterizing the special security instructions as an order, Petitioners cannot now recharacterize those instructions as a legislative rule to manufacture a procedural APA violation. Such gamesmanship should not be permitted.

If Petitioners are correct on jurisdiction, their notice-and-comment argument is wrong. The APA's notice-and-comment procedures apply only to "rule making." 5 U.S.C. § 553. An "order" is categorically exempt from those procedures. The special security instructions issued under § 99.7 through a Notice to Airmen is an air-traffic directive, which is a site-specific disposition managing the airspace at a

single location of the kind this Court has long reviewed as an "order" under Section 46110. *See Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 598 (D.C. Cir. 2007) (giving "order" under Section 46110 a broad, functional construction); *City of Dania Beach v. FAA*, 485 F.3d 1181, 1187-88 (D.C. Cir. 2007) (FAA letter directing changes in runway use was a reviewable order). It does not establish a new airspace classification, create a generally applicable rule of conduct, or bind the public at large. It directs aircraft operations in a defined area in response to a specific, identified security need. That is presumably why Petitioners called it an "order" to obtain this Court's review.

The notice-and-comment provision Petitioners invoke cannot bear the weight they place on it, and their own characterization of the instructions as an order reveals why. Section 40103(b)(4) applies by its terms only to "a regulation prescribed under this subsection." A decision issued under § 99.7 springs from a regulation but is not itself a regulation, but rather an order implementing that regulation in a specific operational context. Congress understood this distinction, using both "regulations and orders" in § 40103(b)(3)(B), confirming not every action taken under the statute is a regulation subject to notice and comment.

Petitioners' cited authorities do not rescue their position and do not grapple with the consequences of their own jurisdictional characterization. *North Carolina v. FAA*, 957 F.2d 1125 (4th Cir. 1992), addressed special-use airspace designated

through formal rulemaking, not security instructions under § 99.7. Petitioners cannot use a case about a rule to undermine their own concession that the decision here is an order. Nor has the FAA ever acknowledged that special security instructions of this kind require notice and comment. The document on which Petitioners rely addresses a special-use airspace designation, which is a rule, not § 99.7 special security instructions. AR 169. Petitioners pleaded their way into this Court by calling these actions orders. They cannot now pretend otherwise.

**2. At a minimum, the good-cause exception applies.**

*Second*, even if the temporary flight restriction were treated as a rule rather than an order, notice and comment still were not required. The APA's good-cause exception excuses notice and comment where they would be "impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). Such is the case here. The special security instructions were issued under 14 C.F.R. § 99.7 through a Notice to Airmen, the established mechanism for immediately effective special security instructions. Section 99.7 exists so that the FAA, in coordination with national security agencies, can respond rapidly to evolving threats. Subjecting such security instructions to months of advance notice and public comment would defeat their protective purpose and would be impracticable and contrary to the public interest. *See Jifry*, 370 F.3d at 1179 (upholding the FAA's invocation of the good-cause exception where a legitimate security threat renders notice and

comment “impracticable” and “contrary to the public interest” because “delay could result in serious harm”).

If the FAA had to publicly announce the need for a flight restriction before it could act, it would open a dangerous window of vulnerability. Advance notice would give bad actors an opportunity to exploit the period when the airspace is unprotected. For example, someone intent on disrupting operations could attempt an unauthorized drone flight, a reckless low-altitude aircraft pass, or other activities designed to test or breach security boundaries. These kinds of threats become more feasible when adversaries know when enforcement is not yet in place. Requiring notice without the ability to act immediately would undermine the very purpose of the flight restriction and could create additional national security risks by signaling when the President’s residence is most exposed.

Moreover, the FAA’s ability to use a temporary flight restriction under § 99.7 has allowed it to consider initiating rulemaking that would permanently restrict operations in the airspace over Mar-a-Lago, as requested by the Secret Service. The rulemaking process typically includes full public notice and an opportunity for comment. Although the FAA has not yet proposed this permanent restriction, it may soon. Without this interim authority, the FAA might have to rely on other tools to ensure the President’s safety while considering the lengthier rulemaking process or forego notice-and-comment rulemaking for good cause.

Petitioners' reliance on the FAA's rulemaking to establish Prohibited Area P-75 over Trump Tower in New York under FAA Order 7400.2R confirms why notice and comment are an ill fit. Pet. Br. 30-31. A prohibited area is a permanent, charted feature of the National Airspace System established through rulemaking. Special security instructions under § 99.7 are distinct, time-limited security mechanisms designed to provide protection immediately while longer-term measures are considered. Indeed, the FAA also imposed a § 99.7 restriction over Trump Tower while it proceeded through rulemaking. NOTAM FDC 5/2811. The availability of a lengthier rulemaking path does not render unlawful the FAA's use of its rapid response authority. Petitioners' argument that the FAA must subject special security instructions to notice and comment should be rejected.

**3. Petitioners cannot establish prejudice.**

*Third*, even if some procedural misstep occurred, Petitioners cannot demonstrate the prejudice the APA requires where the flight restriction was imposed based on threat assessments of the Secret Service and no commenter with notice of the FAA's pending order could reasonably alter that threat assessment. 5 U.S.C. § 706; *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) ("If the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration.").

## II. The FAA complied with NEPA.

The FAA fulfilled its NEPA obligations. The flight restriction itself required no NEPA review because, among other reasons, the restriction removes aircraft rather than concentrating noise. And the FAA completed environmental review of the enduring flight procedures, the agency action producing the claimed effects, before those procedures issued. The FAA properly found the flight-procedure modifications to be categorically excluded from further NEPA review because noise modeling showed no significant increases across the study area and there were no extraordinary circumstances precluding application of the categorical exclusion. This Court should affirm the FAA's analysis under the highly deferential standard applicable to agency NEPA decisions after *Seven County*.

### A. The special security instructions required no environmental review.

Three independent grounds defeat Petitioners' claim that the FAA was required to conduct NEPA review before issuing the special security instructions. Pet. Br. 39-44. *First*, the security instructions themselves caused none of the environmental effects Petitioners identify. The direct effect of restricting airspace within one nautical mile of Mar-a-Lago is the removal of aircraft from that space, which means less noise over the restricted area, not more. Every noise impact Petitioners allege flows from the rerouting of traffic around the restriction, that is, from the modified flight procedures. And the FAA subjected that action to

environmental review before the enduring procedures issued in January 2026, including a noise screening analysis, a categorical exclusion determination, a Section 106 consultation, and a Section 4(f) evaluation. AR 1999-2053. Thus, even if NEPA applies to the special security instructions, the analysis the FAA performed addressed the only environmental effects the restriction could produce, and any failure to prepare a separate, duplicative review of the flight restriction itself is non-prejudicial. *See* 5 U.S.C. § 706 ("due account shall be taken of the rule of prejudicial error")*; Nevada v. Dep't of Energy*, 457 F.3d 78, 90-91 (D.C. Cir. 2006) (applying APA's prejudicial error rule to NEPA deficiencies).[5]

*Seven County* confirms that an agency is not required to trace environmental effects through subsequent, independently reviewed agency actions. 605 U.S. at 181-83. The flight procedure changes, which are the actions that actually produce the noise effects Petitioners complain of, received their own NEPA review before they issued. The FAA thus reviewed the environmental consequences of the airspace change *before* the procedures that produce those consequences took effect. Under *Seven County*, this Court owes deference to the FAA's judgment about when and how to structure its environmental analysis. *Id.* at 181; *Save the Sound, Inc. v. FAA*, No. 24-1028, 2026 WL 2093931, at *3-*8 (D.C. Cir. July 21, 2026).

---

[5] The same analysis applies to the NHPA and Section 4(f).

*Second*, the order issuing the special security instructions is a temporary, one-year emergency measure. AR 233. Interim actions responding to security exigencies are poor candidates for front-end environmental review, and the FAA's approach reflects exactly the sequence sound administration requires. S*ee Nat'l Audubon Soc'y v. Heste*r, 801 F.2d 405, 407-08 (D.C. Cir. 1986) (sustaining streamlined NEPA process for emergency protective measures). It acted immediately on the identified threat, completed environmental review of the enduring procedure changes before they issued, and will pursue any permanent restriction through APA rulemaking, as the Trump Tower prohibited area rulemaking illustrates. 91 Fed. Reg. at 48255.

Petitioners' reliance on staff observations does not help them. Pet. Br. 7. The staff observation that noise "studies would likely need to occur if we procedurally change these flight paths," AR 470, confirms compliance rather than evasion. Before the FAA changed the flight procedures in January 2026, it conducted those studies. AR 1999-2053. The prediction was accurate, and the agency fulfilled it.

*Third*, NEPA applies only where environmental analysis can actually inform an agency's decision. *Department of Transportation v. Public Citizen*, 541 U.S. 752 (2004), holds that where an agency "simply lacks the power to act on whatever information might be contained" in an environmental study, NEPA imposes no obligation, because analysis that cannot affect the outcome accomplishes nothing.

541 U.S. at 768-70. The Supreme Court reaffirmed that principle in *Seven County*, 605 U.S. at 181, and it controls here. The FAA's discretion under 14 C.F.R. § 99.7 was bounded by the Secret Service's protective determination that a continuous airspace restriction was necessary for the President's security. Whatever an environmental study might have concluded about noise levels, the FAA could not realistically have declined a restriction the Secret Service deemed a "critical layer" to the President's safety and to national security. AR 2005. Where environmental information cannot alter an agency's choice, NEPA does not require the agency to compile it. *See Citizens Against Rails-to-Trails v. STB*, 267 F.3d 1144, 1151-52 (D.C. Cir. 2001); *Goos v. ICC*, 911 F.2d 1283, 1295 (8th Cir. 1990).

### B. The FAA reasonably determined that the flight procedure modifications fall within Categorical Exclusion B-2.5(i).

The FAA complied with NEPA before implementing the amended flight procedures at the Airport in January 2026. AR 1999-2003. These amendments include revised RNAV approaches, modified departure procedures, and related routing adjustments designed to avoid the restricted airspace area east of the Airport. AR 1999. Contrary to Petitioners' statements, these procedures were not "new" or "completely overhauled."[6] Pet. Br. 47. The redesign consisted largely of

[6] AHABB was the sole newly created procedure among the January 2026 changes, and falls within the first categorical exclusion provision. Every other modified procedure was a modification to an existing procedure. AR 2014-22. Moreover, AHABB was expected to have, and has seen, negligible use since its introduction.

departure-procedure amendments and the reinstatement of approaches previously approved and flown, *not* the wholesale invention of new flight paths over neighborhoods that had never experienced aircraft noise. Thus, because the action did not involve ground disturbance, construction, or land-use changes, it fell squarely within the category of routine air traffic control procedural changes contemplated by FAA Categorical Exclusion B-2.5(i) (AR 4787). AR 1999-2003.

That categorical exclusion contains two distinct provisions relevant here. The first covers new or revised procedures below 3,000 feet that "do not cause traffic to be routinely routed over noise-sensitive areas." AR 4787. The second, and the one on which the FAA principally relied, covers modifications to currently approved procedures below 3,000 feet that "do not significantly increase noise over noise-sensitive areas." AR 2000, 4787. Petitioners conflate these two provisions, reading the "routinely routed over noise-sensitive areas" language of the first into the second. Pet. Br. 47. That conflation is unfounded. The FAA applied the second prong, which turns exclusively on whether noise is significantly increased and not on whether any noise-sensitive area is overflown. Because all but one of the procedure changes were modifications to previously approved

---

AR 1999. It also has no connection to the noise impacts Petitioners complain of, as it is used for small and relatively quiet propeller planes. In any event, the FAA cancelled the AHABB procedure, effective July 9, 2026.

procedures and *not* new procedures routing flights over noise-sensitive areas for the first time, the second prong is the operative provision.

The FAA reasonably concluded that the no significant increase criterion of the second prong is satisfied based on a detailed, data-driven noise screening analysis conducted using the approved noise-impact screening tools. AR 2000. The analysis was robust. AR 2028-46. Even though the model requires only 30 days of randomly selected track data spanning one year, the FAA used 59 days to ensure more reliable results and modeled both baseline and alternative scenarios using realistic flight path "backbones" derived from radar data and air traffic control input. AR 2034-37. It also incorporated expected operational changes, including redistribution of arrivals and modified departure procedures to avoid the restricted airspace. AR 2036-37.

Using model-generated noise grids across a 12-nautical-mile study area, the FAA compared Day-Night Sound Level values between the baseline and proposed scenarios at thousands of receptor points. AR 2037-39. The results confirmed that the proposed action would not cause any significant noise increases, *i.e.*, no increases of 1.5 decibels or more in areas at or above 65 decibels. AR 2040-45. The FAA therefore rationally concluded that Categorical Exclusion B-2.5(i) was applicable. AR 2002.

The analysis did identify reportable noise increases in certain locations, including 5+ decibel increases in areas exposed to 45-60 decibels in Palm Beach, and 3+ decibel increases in areas exposed to 60-65 decibels northeast of the Airport. AR 2042-2043. But those increases fall below the FAA's significance threshold of 1.5+ decibel increase at 65 decibels or higher. AR 2001. Moreover, the modeling also identified noise decreases in other areas, including reductions aligned with the former Runway 28R flight path and within the restricted airspace footprint itself. AR 2044-2045.

Under FAA Order 1050.1G and governing law, the presence of some localized, non-significant increases does not preclude reliance on a categorical exclusion. *See* FAA Order 1050.1G, Appx. B-1(a)(2) (AR 4777) ("An effect involving one or more of the circumstances described below in connection with a proposed action does not require the preparation of an EA or EIS unless the additional determination is made that the proposed action may have a significant environmental effect"); *City of Alexandria, Va. v. Fed. Highway Admin*., 756 F.2d 1014, 1021 (4th Cir. 1985) (upholding categorical exclusion where agency considered potential impacts and found them insubstantial). The FAA's conclusion that the action does not significantly increase noise is therefore well supported and entitled to deference. *See Seven Cnty*., 605 U.S. at 183.

Petitioners' attack on the noise screening analysis rests on a mistaken premise that the screening's baseline included flight-track data from December 20, 2025, a date postdating the flight restriction. Pet. Br. 54-56. It did not. The baseline was drawn exclusively from days within the September 2024 through August 2025 window, before the restriction took effect, and no post-restriction track data was incorporated into it. AR 2034-35. The December 20 date appears in the analysis only because it was identified and then excluded due to unavailable data. The screening thus rests on a robust sample of qualifying pre-restriction days, which is more than sufficient under the FAA-approved methodology.

In any event, the Court's task is to determine whether the agency's analytical approach was reasonable, not flawless, and an agency's technical and modeling choices are entitled to the highest level of deference. *Balt. Gas & Elec. Co.*, 462 U.S. at 103; *Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1052 (D.C. Cir. 2001) ("That a model is limited or imperfect is not, in itself, a reason to remand agency decisions based upon it."). Even if the baseline had included the single day Petitioners identify, any such imperfection would be harmless. The reportable increases identified by the screening fell well below the 1.5-decibel significance threshold at 65 decibels, AR 2001, 2040-45, and Petitioners offer nothing beyond speculation that adjusting one day of data would alter that conclusion. Indeed, the model requires only 30 days of data, whereas the FAA used 59 days here. *See*

MITRE, *Average Annual Day Addendum to the Guidance for Noise Screening of Air Traffic Actions*, at 1.1, 3.4, 4, Mar. 2013, https://aedt.faa.gov/Documents/aad_addendum_to_guidance_document.pdf. Any methodological imperfection that could not have affected the outcome is not prejudicial. *See Jicarilla Apache Nation v. Dep't of Interior*, 613 F.3d 1112, 1121 (D.C. Cir. 2010) ("The burden to demonstrate prejudicial error is on the party challenging agency action.").

Petitioners' public-engagement arguments are also misplaced. Pet. Br. 46. FAA Order 1050.1G does not mandate, or even contemplate, public engagement when the FAA prepares a categorical exclusion. Indeed, there is no expectation of public engagement even when the FAA prepares a more detailed environmental assessment. AR 4778. As a matter of course, the FAA issues Notices to Airmen and implements procedure changes without public comment, and no legal requirement obligated the agency to depart from that practice here. The absence of public engagement is therefore not a procedural defect or some fictional attempt by the FAA to avoid public scrutiny. Categorical exclusions exist to allow agencies to avoid time-consuming procedural steps, so that they may fulfill their statutory missions while focusing their environmental reviews on more environmentally significant matters. *See Earth Island Inst. v. Muldoon*, 82 F.4th 624, 636 (9th Cir. 2023) ("the entire point of categorical exclusions is to reduce the administrative

burden of approving certain projects"). The use of a categorical exclusion without public engagement was both permissible and appropriate here.

### C. No extraordinary circumstances preclude use of a categorical exclusion.

Even where a categorical exclusion applies, the FAA must consider whether extraordinary circumstances warrant further environmental review. *See* FAA Order 1050.1G, Appx. B-2.5 (AR 4787); *CBD*, 706 F.3d at 1097. The FAA conducted that inquiry across all relevant environmental impact categories. AR 2000-02 (analysis); AR 4777-4748 (relevant categories). Beyond noise, the FAA evaluated air quality, historical and cultural resources, biological resources, water resources, visual effects, and Section 4(f) properties. AR 2000-02. It found no extraordinary circumstances, confirming that the action does not present the type of unusual or environmentally consequential circumstances that would preclude use of a categorical exclusion. *Id. Seven County* makes clear that courts must uphold such determinations where the agency has reasonably examined the relevant considerations. *See Sierra Club*, 153 F.4th at 1311.

Petitioners' contrary argument conflates public opposition to the airspace closure with the kind of technical controversy on environmental grounds that may constitute an extraordinary circumstance. Pet. Br. 49-54. The two are distinct. Under FAA Order 1050.1G, an action is "highly controversial on environmental grounds" only where there is "reasonable disagreement over the degree, extent, or

nature of a proposed action's environmental impacts." AR 4778. Mere opposition, even vocal and widespread opposition, does not suffice. *See Protect Our Parks, Inc. v. Buttigieg*, 39 F.4th 389, 398 (7th Cir. 2022) ("NEPA does not contain a heckler's veto.") (cleaned up). "Controversy" in the NEPA sense refers to disputes over the size or nature of an action's environmental effects, not the mere "existence of opposition to a use." *Town of Cave Creek v. FAA*, 325 F.3d 320, 331 (D.C. Cir. 2003) (citation omitted); *see also Fund for Animals v. Frizzell*, 530 F.2d 982, 988 n.15 (D.C. Cir. 1975). Petitioners' complaints reflect disagreement with the policy of maintaining a full-time flight restriction over the President's residence and not any reasoned technical disagreement with the FAA's noise modeling. There is no controversy in the NEPA sense.

Nor does *City of Phoenix v. Huerta*, 869 F.3d 963 (D.C. Cir. 2017), compel a different result, even if that decision survives *Seven County*. Pet. Br. 53-54. There, the court found that the FAA gave the affected community no notice of routine procedure changes and then relied on the resulting silence to conclude that the changes were uncontroversial, making it "impossible" for the agency to account for potential controversy. 869 F.3d at 972. Here, by contrast, the FAA was implementing security instructions requested by the Secret Service under exigent, security-driven constraints, and it was fully aware of, and expressly considered, community noise concerns when it conducted its screening analysis and prepared

its categorical exclusion document. AR 2000-02, 2028-47. Far from being blind to asserted impacts, the FAA evaluated them and reasonably concluded that they fell below significance thresholds. That judgment about the appropriate depth of environmental review is the sort of agency choice to which courts owe “substantial deference.” *Seven Cnty.*, 605 U.S. at 183.

Petitioners’ remaining extraordinary-circumstances arguments fare no better. They contend the FAA acted arbitrarily by failing to treat “reportable” noise increases as extraordinary circumstances, citing *City of Phoenix*. Pet. Br. 52-54. But *City of Phoenix* did not establish that reportable increases automatically trigger extraordinary circumstances review. It noted only that an agency had previously characterized such increases as potentially controversial in a specific factual context. 869 F.3d at 972-73. The FAA here evaluated the reportable increases it identified, concluded they were sub-threshold and not environmentally significant, and documented that conclusion. AR 2028-34. That is not an arbitrary departure from precedent. It is the exercise of the technical judgment to which courts should defer under *Seven County*. 605 U.S. at 183. And Petitioners’ argument that the FAA’s own noise screening showed the procedures might have significant impacts misreads the record. The cited document reflects internal contingency planning, not an agency finding that significance thresholds were exceeded. AR 740-41.

* * *

In sum, the FAA conducted a detailed and technically rigorous noise analysis, reasonably determined that the proposed action would not result in any significant noise increases, and confirmed the absence of extraordinary circumstances across all environmental resource categories. Its application of Categorical Exclusion B-2.5(i) is therefore a textbook example of lawful NEPA compliance and must be upheld under the APA's deferential arbitrary-or-capricious standard, particularly in this post-*Seven County* world.

**III. The FAA complied with the NHPA.**

The FAA also complied with Section 106 of the NHPA because it followed the required consultation process and reasonably concluded without objection from the relevant state authority that its action would not adversely affect historic properties. Pursuant to the regulations promulgated by the Advisory Council on Historic Preservation at 36 C.F.R. Part 800, the FAA identified historic properties within the area of potential effects and evaluated whether the flight procedure modifications would affect those resources. AR 2001, 2049-52. The agency determined that any potential impacts would not constitute an adverse effect, explaining that the identified historic properties are valued for their architectural characteristics and that a quiet setting is not an attribute contributing to their eligibility. AR 2001. The FAA further supported this conclusion with its noise analysis, which found no significant increases in noise levels. AR 2028-47, 2050-

51. Consistent with the regulatory framework, the FAA submitted its "no adverse effect" determination to the State Historic Preservation Office (State Office) under 36 C.F.R. § 800.4(d)(1), which concurred in writing. AR 2050-53.

That concurrence is dispositive of the FAA's Section 106 obligations. Where, as here, the agency identifies historic properties, evaluates potential effects, and obtains State Office concurrence in a finding of no adverse effect, the consultation process is complete and no further mitigation or analysis is required. *See Friends of St. Frances*, 658 F.3d at 463. Because Section 106 imposes only procedural requirements, the FAA's compliance with the prescribed steps, culminating in State Office concurrence, fully satisfies the statute.

Petitioners' contention that the consultation was too brief to satisfy the statute fails for several reasons. Pet. Br. 58-61. To begin, nothing in Section 106 or its implementing regulations prescribes any minimum duration for consultation. The measure of NHPA adequacy is functional, not chronological. It is whether the State Office received the information needed to evaluate the agency's finding. 36 C.F.R. § 800.11(a). Here, the FAA's letter identified the area of potential effects, explained the noise-screening methodology that defined it, and identified the historic properties within it. AR 2049-52. The State Office concurred without requesting additional time, additional information, or any modification. AR 2053.

This prompt turnaround on this procedurally simple undertaking reflects the straightforward nature of the action, not a defect in the process.

Moreover, the consultation right Petitioners say was rushed belongs to the State Office, and the State Office did not object, seek an extension, or condition its concurrence. Where the agency makes a finding of no adverse effect and the State Office concurs, the regulations declare the process complete. 36 C.F.R. § 800.5(c), (d)(1); *Friends of St. Frances*, 658 F.3d at 463. Petitioners cite no authority permitting a third party to invalidate a concurrence from the appropriate consulting official. Indeed, Petitioners' argument boils down to an assertion that the State Office was insufficiently protective of its own prerogatives.

The consultation was also pre-decisional, as the statute requires. Section 106 directs the agency to take effects into account "prior to" approval of the undertaking, 54 U.S.C. § 306108, and the consultation here concluded on January 21, 2026, before the procedures were published and took effect the following day. AR 2053. Petitioners' real complaint is that the FAA arrived at the consultation with a proposed determination, but that is exactly how the regulations are designed to operate. The agency makes a finding and submits it to the State Office for concurrence or objection. 36 C.F.R. § 800.5(b)-(c). An agency does not violate the NHPA by proposing a determination; that proposal is precisely what the State Office exists to check. Had the State Office disagreed, there was a path for

resolving the dispute. *See*, *e.g.*, 30 C.F.R. § 800.5(c)(2). Instead, the State Office agreed and the statute was satisfied.

Like NEPA, the NHPA requires agencies only to "stop, look, and listen." *Narragansett Indian Tribe*, 334 F.3d at 166. The pacing of that process is exactly the kind of judgment to which courts owe deference, particularly when it is conducted under genuine time constraints created by the Secret Service's statutory mandate to protect the President. *Seven Cnty*., 605 U.S. at 183.

Petitioners argue that the FAA committed a procedural faux pas by not consulting with local governments or the public. Pet. Br. 59-60. Not so. Where needed to respond to immediate threats to life or property, the NHPA expressly authorizes expedited consultation procedures that compress or modify the standard NHPA requirements. 36 C.F.R. § 800.12. But the State Office's concurrence established at the threshold that no adverse effect existed (AR 2053), meaning the predicate condition for broader consultation never ripened in the first place. The FAA's consultation with the State Office was therefore not a shortcut around the regulations but a correct application of them under the circumstances presented to the FAA by the Secret Service's request.

In any event, the APA's prejudicial error rule applies fully to NHPA review, and remand is unwarranted where any consultation deficiency demonstrably could not have affected the outcome. *See Save Our Heritage, Inc. v. FAA*, 269 F.3d 49,

62 (1st Cir. 2001) (finding lack of consultation under NHPA harmless). Petitioners' concerns about quiet-setting attributes could not have altered the FAA's finding, which rested on noise screening showing no significant increases anywhere in the study area. AR 2028-47. And the FAA did account for less significant noise impacts on historic properties, Pet. Br. 65, by analyzing the effects of noise increases that could alter historic properties despite a quiet setting not being a characteristic that qualifies them for NHPA listing. AR 2001, 2050.

Likewise, Petitioners cannot show that consultation with local officials or the public would have produced a materially different record because the no adverse effect determination rests on a finding that historic significance for *every* affected property derives from architectural character, not a quiet setting or ambient environment. AR 2001, 2050. And the State Office independently validated that finding. AR 2053. The properties inadvertently omitted from the initial review present no different analysis as the same rationale applies with equal force, confirming the consistency and correctness of the agency's approach. The NHPA exists to protect historic properties from adverse effects, not to invalidate agency actions on procedural grounds when the substantive outcome is fully supported by the record. *Cf. Seven Cnty.*, 605 U.S. at 178.

Furthermore, many of Petitioners' arguments under the NHPA and Section 4(f) improperly rest on declarations prepared for this litigation. Pet. Br. 62, 64, 65,

68, 70 (relying on extra-record declarations). But judicial review under 49 U.S.C. § 46110 is confined to the administrative record. *See Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam). Declarations that may support standing cannot establish that the agency's determination was arbitrary or capricious. *Id.* This Court must disregard all merits-based arguments relying on those declarations. *See Hill Dermaceuticals v. FDA*, 709 F.3d 44, 47 (D.C. Cir. 2013) ("it is black-letter administrative law that in an APA case, a reviewing court should have before it neither more nor less information than did the agency when it made its decision.") (internal quotations and citation omitted). As the record demonstrates, the FAA complied with the NHPA.

## IV. The FAA complied with Section 4(f) of the Department of Transportation Act.

The FAA also fully complied with Section 4(f) because the record demonstrates that the challenged airspace modifications do not result in either an actual or constructive "use" of any Section 4(f) protected resource. AR 2002. As an initial matter, the FAA's action involves only changes to flight procedures and airspace management and does not entail any physical occupancy, land acquisition, or incorporation of publicly owned parks, recreation areas, wildlife refuges, or historic sites. *Id.* ("Air traffic actions do not result in any physical use of properties."). Accordingly, there is no actual "use" under Section 4(f).

The FAA also reasonably determined that no constructive use would occur. AR 2002. Constructive use arises only where a project "substantially impairs" the protected activities, features, or attributes of a Section 4(f) property, including through significant noise impacts. AR 2290-91, 3164. Here, the FAA applied its approved environmental screening tools, and found no significant increases in noise in any relevant area. AR 2001, 2028-47. Although the analysis identified limited "reportable" noise increases, it confirmed the absence of any "significant" noise impacts under FAA Order 1050.1G, rebutting any finding of substantial impairment. AR 2001. 2040-43. On that basis, the FAA reasonably concluded that the airspace changes would not diminish the protected characteristics of any Section 4(f) property. AR 2002.

That determination is further supported by the nature of the affected resources and the agency's broader environmental review. The FAA confirmed that the action would not alter traffic volumes, fleet mix, or visual character, and would not introduce ground disturbance or other physical effects. AR 2001-02. The agency likewise found no wildlife refuges or similar resources within the area of any reportable noise changes. AR 2002. In these circumstances, the agency permissibly concluded that the proposed action would not interfere with the use or enjoyment of any Section 4(f) resource. *Id*. Because there is neither actual use nor

constructive use, Section 4(f) imposes no further procedural or substantive obligations, and the FAA was not required to prepare a Section 4(f) evaluation.

Because there would be no "use" of Section 4(f) properties, no consultation duties arise. Pet. Br. 66-69. FAA guidance directs consultation with public officials when determining whether project-related impacts would substantially impair the resources. AR 4662. That provision calibrates consultation to circumstances presenting a genuine question of "substantial impair[ment]" and not to every airspace action producing a reportable noise increase. AR 2291. Because the modeled noise increases did not approach the level at which park resources could be substantially diminished, the FAA reasonably concluded that no constructive use existed and no Section 4(f) consultation obligations arose.

Similarly, Petitioners' remaining Section 4(f) arguments also wrongly assume obligations that arise only after a determination that protected property would be "used." Pet. Br. 70-71. The "no prudent and feasible alternative," "all possible planning," and 23 C.F.R. § 774.3 approval requirements apply only to a project that uses Section 4(f) property. 49 U.S.C. § 303(c). The FAA reasonably found no use, as its analysis showed noise increases below significance thresholds across a study area encompassing each park Petitioners identify. AR 2032-45; *City of Grapevine v. Dep't of Transp.*, 17 F.3d 1502, 1508 (D.C. Cir. 1994) (sustaining

the FAA's reliance on standardized noise metrics to conclude that aircraft noise did not constitute a Section 4(f) use of nearby recreational and historic properties).

Nor is there any flaw in FAA's noise or Section 4(f) analysis. Pet. Br. 69-70. As already discussed at pages 41-42, the FAA's noise analysis was not flawed. The FAA's determination that there is no significant noise increase applies no matter the features or attributes of any park. The FAA determination is not "conclusory." Pet. Br. 65. It expressly rests on the changes in aircraft location and the noise screening. AR 2002, 2028-47. Petitioners identify no authority requiring a property-by-property narrative about quiet environment and scenic views.

In sum, the FAA complied with Section 4(f) and any error is harmless.

## V. Vacatur would be an inappropriate remedy.

Even if the Court were to identify a non-harmless, prejudicial error, Petitioners' request for vacatur should be denied. Pet. Br. 71-73. Whether to vacate turns on (1) "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly)" and (2) "the disruptive consequences of an interim change that may itself be changed." *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993). Both factors counsel remand without vacatur here.

*First*, any deficiency Petitioners have identified is procedural and readily curable. Where there is at least a serious possibility that the agency can

substantiate its decision on remand, remand without vacatur is appropriate. *Id.* at 151; *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 197-98 (D.C. Cir. 2009) (remand without vacatur is appropriate where the agency's failure is one of explanation or procedure that it may readily cure); *Black Oak Energy v. FERC*, 725 F.3d 230, 244 (D.C. Cir. 2013). That is particularly true of the APA, NEPA, NHPA, and threshold Section 4(f) claims, which are procedural and require no substantive outcome the agency could not lawfully reach again after remand.

*Seven County* reinforces that conclusion as it instructed that NEPA's "purely procedural" character must inform not only the scope of judicial review but also the remedy. It instructs that, even if a NEPA analysis "falls short in some respects, that deficiency may not necessarily require a court to vacate the agency's ultimate approval of a project, at least absent reason to believe the agency might disapprove the project" on remand. *Seven Cnty*., 605 U.S. at 185. Because the APA, NEPA, the NHPA, and the threshold determinations under Section 4(f) dictate process rather than outcomes, a procedural shortfall warrants vacatur only where it could plausibly have changed the agency's substantive decision.

Here, there is no reason to believe that further explanation, environmental documentation, additional NHPA consultation, or supplemental Section 4(f) analysis would lead the FAA to abandon flight procedures designed to keep aircraft clear of restricted airspace the Secret Service has deemed necessary for the

President's protection. AR 2005. Both the flight restriction and modified procedures respond to a security imperative that environmental process cannot alter. This Court has already recognized that *Seven County* marks the end of "the era of searching NEPA review," *Sierra Club*, 153 F.4th at 1311, and the same restraint fully applies at the remedial stage. Reflexive vacatur for asserted procedural imperfections would resurrect the very judicial micromanagement the Supreme Court has foreclosed.

*Second*, the disruptive consequences of vacatur would be substantial. Vacating the flight restriction would strip away a protective measure that the Secret Service has determined is a "critical layer" of its protective security posture amid adverse threat intelligence. AR 345, 2005. Petitioners profess that "the President's security is paramount," Pet. Br. 18, but the relief they seek belies that concession. They ask this Court to dismantle the very protection the Nation's foremost protective security agency has deemed necessary, while declining even to name the Secret Service as a respondent. *See Watts v. United States*, 394 U.S. 705, 707 (1969) ("The Nation undoubtedly has a valid, even an overwhelming, interest in protecting the safety of its Chief Executive and in allowing him to perform his duties without interference from threats of physical violence."); *Wood v. Moss*, 572 U.S. 744, 748 (2014) ("safeguarding the President is also of overwhelming importance in our constitutional system").

The consequence of that litigation choice is significant. The Secret Service's threat assessment, including the classified intelligence that underlies it, is not before this Court, has not been challenged in any proceeding, and must therefore be taken as valid. *See Latif v. Obama*, 677 F.3d 1175, 1178 (D.C. Cir. 2011) ("The presumption of regularity supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.") (citation omitted). Petitioners cannot circumvent the expert judgment of an agency they chose not to sue by attacking the FAA's implementation of it.

Nor is the judiciary in a position to discount that judgment. Protective intelligence assessments of threats to protected people or properties are the province of the Executive, resting on intelligence sources and protective expertise the courts lack. *See Holder*, 561 U.S. at 33-35; *Egan*, 484 U.S. at 529; *Schneider*, 412 F.3d at 196. That deference is especially warranted where, as here, the threat environment facing the President and other protected officials who frequent Mar-a-Lago has been marked by a documented pattern of recent, serious incidents directed at protected persons and protected sites, together with heightened geopolitical hostility that has included direct calls for the President's assassination. Quinn Decl. ¶¶ 6-8, 11. As Deputy Director Matthew C. Quinn of the Secret Service explains in his declaration submitted solely to explain the disruptive and

potentially dangerous consequences of vacatur, a restriction that applies consistently, rather than one that turns on and off with the President's travel schedule, is what allows the Secret Service to reliably distinguish innocuous activity from a genuine threat and to respond before harm occurs. *Id.* ¶¶ 12, 14-15. Petitioners' request to remove that restriction would strip away a tool the Secret Service has determined is necessary, at a moment when the threat picture is especially acute. *Id.* Requesting vacatur is irresponsible.

Because the flight restriction must remain in place, so too must the flight procedure modifications. The modified procedures exist to let aircraft operate safely and efficiently in a manner that accounts for the restricted airspace over Mar-a-Lago. Removing the procedures while the restriction itself stays in effect does not restore the airport to normal operations. It instead leaves pilots and controllers to navigate around an active security restriction without the structured routes that were built for exactly that purpose. McIntosh Decl. ¶¶ 2, 4.

That gap cannot be closed quickly or informally. New instrument procedures require a rulemaking and publication process that will take at least six to eight months. *Id.* ¶ 3. In the interim, controllers would have to manually vector aircraft around the restriction, straining capacity on the very runway that carries the overwhelming share of commercial traffic, while the Airport's alternate runway is neither equipped nor sized to absorb the overflow. *Id.* ¶¶ 4-13. The practical result

would be prolonged and seriously disruptive consequences for the Airport, airlines, and the traveling public alike. *Id.* ¶ 14. Under *Allied-Signal*, that combination of serious, sustained disruption weighs decisively against vacatur of the flight procedures too. *See Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 98 (D.C. Cir. 2002) (declining to vacate where vacatur would itself threaten significant harm to weighty public interests); *N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 860-61 (D.C. Cir. 2012) (same). Even if the FAA committed a non-harmless procedural error, vacatur is not warranted.

**CONCLUSION**

For the foregoing reasons, the petitions should be denied.

Respectfully submitted,

/s/ *Allen M. Brabender*

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*

ROBERT N. STANDER
*Deputy Assistant Attorney General*

ALLEN M. BRABENDER
*Attorney*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 532-3281
allen.brabender@usdoj.gov

Of Counsel:

WILLIAN MCKENNA
*Chief Counsel*

MICHAEL FINEMAN
GAHAN CHRISTENSON
LAURA PRICE
*Attorneys*
Federal Aviation Administration

August 11, 2026
DJ # 90-13-1-18070

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) this document contains 12,970 words.

2. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

/s/ *Allen M. Brabender*
Allen M. Brabender
*Counsel for Respondent*

## ADDENDUM TABLE OF CONTENTS

18 U.S.C. § 3056 .......... 1a

18 U.S.C. § 3056A .......... 4a

14 C.F.R. § 99.7 .......... 7a

36 C.F.R. § 800.11 .......... 8a

36 C.F.R. § 800.12 .......... 11a

United States Code Annotated
Title 18. Crimes and Criminal Procedure (Refs & Annos)
Part II. Criminal Procedure
Chapter 203. Arrest and Commitment

18 U.S.C.A. § 3056

§ 3056. Powers, authorities, and duties of United States Secret Service

Effective: December 27, 2022
Currentness

**(a)** Under the direction of the Secretary of Homeland Security, the United States Secret Service is authorized to protect the following persons:

**(1)** The President, the Vice President (or other officer next in the order of succession to the Office of President), the President-elect, and the Vice President-elect.

**(2)** The immediate families of those individuals listed in paragraph (1).

**(3)** Former Presidents and their spouses for their lifetimes, except that protection of a spouse shall terminate in the event of remarriage.

**(4)** Children of a former President who are under 16 years of age.

**(5)** Visiting heads of foreign states or foreign governments.

**(6)** Other distinguished foreign visitors to the United States and official representatives of the United States performing special missions abroad when the President directs that such protection be provided.

**(7)** Major Presidential and Vice Presidential candidates and, within 120 days of the general Presidential election, the spouses of such candidates. As used in this paragraph, the term "major Presidential and Vice Presidential candidates" means those individuals identified as such by the Secretary of Homeland Security after consultation with an advisory committee consisting of the Speaker of the House of Representatives, the minority leader of the House of Representatives, the majority and minority leaders of the Senate, and one additional member selected by the other members of the committee. The Committee shall not be subject to chapter 10 of title 5.

**(8)** Former Vice Presidents, their spouses, and their children who are under 16 years of age, for a period of not more than six months after the date the former Vice President leaves office. The Secretary of Homeland Security shall have the authority to direct the Secret Service to provide temporary protection for any of these individuals at any time thereafter if the Secretary of Homeland Security or designee determines that information or conditions warrant such protection.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

The protection authorized in paragraphs (2) through (8) may be declined.

**(b)** Under the direction of the Secretary of Homeland Security, the Secret Service is authorized to detect and arrest any person who violates--

**(1)** section 508, 509, 510, 871, or 879 of this title or, with respect to the Federal Deposit Insurance Corporation, Federal land banks, and Federal land bank associations, section 213, 216, 433, 493, 657, 709, 1006, 1007, 1011, 1013, 1014, 1907, or 1909 of this title;

**(2)** any of the laws of the United States relating to coins, obligations, and securities of the United States and of foreign governments; or

**(3)** any of the laws of the United States relating to electronic fund transfer frauds, access device frauds, false identification documents or devices, and any fraud or other criminal or unlawful activity in or against any federally insured financial institution; except that the authority conferred by this paragraph shall be exercised subject to the agreement of the Attorney General and the Secretary of Homeland Security and shall not affect the authority of any other Federal law enforcement agency with respect to those laws.

**(c)(1)** Under the direction of the Secretary of Homeland Security, officers and agents of the Secret Service are authorized to--

**(A)** execute warrants issued under the laws of the United States;

**(B)** carry firearms;

**(C)** make arrests without warrant for any offense against the United States committed in their presence, or for any felony cognizable under the laws of the United States if they have reasonable grounds to believe that the person to be arrested has committed or is committing such felony;

**(D)** offer and pay rewards for services and information leading to the apprehension of persons involved in the violation or potential violation of those provisions of law which the Secret Service is authorized to enforce;

**(E)** pay expenses for unforeseen emergencies of a confidential nature under the direction of the Secretary of Homeland Security and accounted for solely on the Secretary's certificate; and

**(F)** perform such other functions and duties as are authorized by law.

**(2)** Funds expended from appropriations available to the Secret Service for the purchase of counterfeits and subsequently recovered shall be reimbursed to the appropriations available to the Secret Service at the time of the reimbursement.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**(d)** Whoever knowingly and willfully obstructs, resists, or interferes with a Federal law enforcement agent engaged in the performance of the protective functions authorized by this section or by section 1752 of this title shall be fined not more than $1,000 or imprisoned not more than one year, or both.

**(e)(1)** When directed by the President, the United States Secret Service is authorized to participate, under the direction of the Secretary of Homeland Security, in the planning, coordination, and implementation of security operations at special events of national significance, as determined by the President.

**(2)** At the end of each fiscal year, the President through such agency or office as the President may designate, shall report to the Congress--

**(A)** what events, if any, were designated special events of national significance for security purposes under paragraph (1); and

**(B)** the criteria and information used in making each designation.

**(f)** Under the direction of the Secretary of Homeland Security, the Secret Service is authorized, at the request of any State or local law enforcement agency in conjunction with an investigation, or at the request of the National Center for Missing and Exploited Children, to provide forensic and investigative assistance.

**(g)** The United States Secret Service shall be maintained as a distinct entity within the Department of Homeland Security and shall not be merged with any other Department function. No personnel and operational elements of the United States Secret Service shall report to an individual other than the Director of the United States Secret Service, who shall report directly to the Secretary of Homeland Security without being required to report through any other official of the Department.

CREDIT(S)

(June 25, 1948, c. 645, 62 Stat. 818; July 16, 1951, c. 226, § 4, 65 Stat. 122; Aug. 31, 1954, c. 1143, § 2, 68 Stat. 999; Pub.L. 86-168, Title I, § 104(h), Aug. 18, 1959, 73 Stat. 387; Pub.L. 87-791, Oct. 10, 1962, 76 Stat. 809; Pub.L. 87-829, § 3, Oct. 15, 1962, 76 Stat. 956; Pub.L. 89-186, Sept. 15, 1965, 79 Stat. 791; Pub.L. 89-218, Sept. 29, 1965, 79 Stat. 890; Pub.L. 90-608, c. XI, § 1101, Oct. 21, 1968, 82 Stat. 1198; Pub.L. 91-644, Title V, § 19, Jan. 2, 1971, 84 Stat. 1892; Pub.L. 91-651, § 4, Jan. 5, 1971, 84 Stat. 1941; Pub.L. 93-346, § 8, July 12, 1974, as added Pub.L. 93-552, Title VI, § 609(a), Dec. 27, 1974, 88 Stat. 1765; Pub.L. 94-408, § 2, Sept. 11, 1976, 90 Stat. 1239; Pub.L. 97-297, § 3, Oct. 12, 1982, 96 Stat. 1318; Pub.L. 97-308, § 2, Oct. 14, 1982, 96 Stat. 1452; Pub.L. 98-151, § 115(b), Nov. 14, 1983, 97 Stat. 977; Pub.L. 98-587, § 1(a), Oct. 30, 1984, 98 Stat. 3110; Pub.L. 103-329, Title V, § 530, Sept. 30, 1994, 108 Stat. 2412; Pub.L. 104-294, Title VI, § 605(i), Oct. 11, 1996, 110 Stat. 3510; Pub.L. 106-544, § 3, Dec. 19, 2000, 114 Stat. 2716; Pub.L. 107-56, Title V, § 506(b), Oct. 26, 2001, 115 Stat. 367; Pub.L. 107-296, Title XVII, § 1703(a)(1), Nov. 25, 2002, 116 Stat. 2313; Pub.L. 108-21, Title III, § 322, Apr. 30, 2003, 117 Stat. 665; Pub.L. 109-177, Title VI, §§ 604, 607, 608(a), Mar. 9, 2006, 120 Stat. 253, 256; Pub.L. 110-326, Title I, § 102, Sept. 26, 2008, 122 Stat. 3560; Pub.L. 112-257, § 2, Jan. 10, 2013, 126 Stat. 2413; Pub.L. 115-393, Title II, § 203, Dec. 21, 2018, 132 Stat. 5271; Pub.L. 117-286, § 4(a)(135), Dec. 27, 2022, 136 Stat. 4320.)

18 U.S.C.A. § 3056, 18 USCA § 3056
Current through P.L. 119-102. Some statute sections may be more current, see credits for details.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

United States Code Annotated
Title 18. Crimes and Criminal Procedure (Refs & Annos)
Part II. Criminal Procedure
Chapter 203. Arrest and Commitment

18 U.S.C.A. § 3056A

§ 3056A. Powers, authorities, and duties of United States Secret Service Uniformed Division

Effective: March 9, 2006
Currentness

**(a)** There is hereby created and established a permanent police force, to be known as the "United States Secret Service Uniformed Division". Subject to the supervision of the Secretary of Homeland Security, the United States Secret Service Uniformed Division shall perform such duties as the Director, United States Secret Service, may prescribe in connection with the protection of the following:

**(1)** The White House in the District of Columbia.

**(2)** Any building in which Presidential offices are located.

**(3)** The Treasury Building and grounds.

**(4)** The President, the Vice President (or other officer next in the order of succession to the Office of President), the President-elect, the Vice President-elect, and their immediate families.

**(5)** Foreign diplomatic missions located in the metropolitan area of the District of Columbia.

**(6)** The temporary official residence of the Vice President and grounds in the District of Columbia.

**(7)** Foreign diplomatic missions located in metropolitan areas (other than the District of Columbia) in the United States where there are located twenty or more such missions headed by full-time officers, except that such protection shall be provided only--

**(A)** on the basis of extraordinary protective need;

**(B)** upon request of an affected metropolitan area; and

**(C)** when the extraordinary protective need arises at or in association with a visit to--

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

**(i)** a permanent mission to, or an observer mission invited to participate in the work of, an international organization of which the United States is a member; or

**(ii)** an international organization of which the United States is a member;

except that such protection may also be provided for motorcades and at other places associated with any such visit and may be extended at places of temporary domicile in connection with any such visit.

**(8)** Foreign consular and diplomatic missions located in such areas in the United States, its territories and possessions, as the President, on a case-by-case basis, may direct.

**(9)** Visits of foreign government officials to metropolitan areas (other than the District of Columbia) where there are located twenty or more consular or diplomatic missions staffed by accredited personnel, including protection for motorcades and at other places associated with such visits when such officials are in the United States to conduct official business with the United States Government.

**(10)** Former Presidents and their spouses, as provided in section 3056(a)(3) of title 18.

**(11)** An event designated under section 3056(e) of title 18 as a special event of national significance.

**(12)** Major Presidential and Vice Presidential candidates and, within 120 days of the general Presidential election, the spouses of such candidates, as provided in section 3056(a)(7) of title 18.

**(13)** Visiting heads of foreign states or foreign governments.

**(b)(1)** Under the direction of the Director of the Secret Service, members of the United States Secret Service Uniformed Division are authorized to--

**(A)** carry firearms;

**(B)** make arrests without warrant for any offense against the United States committed in their presence, or for any felony cognizable under the laws of the United States if they have reasonable grounds to believe that the person to be arrested has committed or is committing such felony; and

**(C)** perform such other functions and duties as are authorized by law.

**(2)** Members of the United States Secret Service Uniformed Division shall possess privileges and powers similar to those of the members of the Metropolitan Police of the District of Columbia.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**(c)** Members of the United States Secret Service Uniformed Division shall be furnished with uniforms and other necessary equipment.

**(d)** In carrying out the functions pursuant to paragraphs (7) and (9) of subsection (a), the Secretary of Homeland Security may utilize, with their consent, on a reimbursable basis, the services, personnel, equipment, and facilities of State and local governments, and is authorized to reimburse such State and local governments for the utilization of such services, personnel, equipment, and facilities. The Secretary of Homeland Security may carry out the functions pursuant to paragraphs (7) and (9) of subsection (a) by contract. The authority of this subsection may be transferred by the President to the Secretary of State. In carrying out any duty under paragraphs (7) and (9) of subsection (a), the Secretary of State is authorized to utilize any authority available to the Secretary under title II of the State Department Basic Authorities Act of 1956.

CREDIT(S)

(Added Pub.L. 109-177, Title VI, § 605(a), Mar. 9, 2006, 120 Stat. 253.)

18 U.S.C.A. § 3056A, 18 USCA § 3056A
Current through P.L. 119-102. Some statute sections may be more current, see credits for details.

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 14. Aeronautics and Space
Chapter I. Federal Aviation Administration, Department of Transportation
Subchapter F. Air Traffic and General Operating Rules
Part 99. Security Control of Air Traffic (Refs & Annos)
Subpart A. General

14 C.F.R. § 99.7

§ 99.7 Special security instructions.

Currentness

Each person operating an aircraft in an ADIZ or Defense Area must, in addition to the applicable rules of this part, comply with special security instructions issued by the Administrator in the interest of national security, pursuant to agreement between the FAA and the Department of Defense, or between the FAA and a U.S. Federal security or intelligence agency.

**Credits**
[69 FR 16756, March 30, 2004]

SOURCE: 53 FR 18217, May 20, 1988; Amdt. 99–17, 60 FR 67255, Dec. 28, 1995, unless otherwise noted.

AUTHORITY: 49 U.S.C. 106(g), 40101, 40103, 40106, 40113, 40120, 44502, 44721.

Current through August 10, 2026, 91 FR 51397. Some sections may be more current. See credits for details.

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 36. Parks, Forests, and Public Property
Chapter VIII. Advisory Council on Historic Preservation
Part 800. Protection of Historic Properties (Refs & Annos)
Subpart B. The Section 106 Process

36 C.F.R. § 800.11

§ 800.11 Documentation standards.

Currentness

(a) Adequacy of documentation. The agency official shall ensure that a determination, finding, or agreement under the procedures in this subpart is supported by sufficient documentation to enable any reviewing parties to understand its basis. The agency official shall provide such documentation to the extent permitted by law and within available funds. When an agency official is conducting phased identification or evaluation under this subpart, the documentation standards regarding description of historic properties may be applied flexibly. If the Council, or the SHPO/THPO when the Council is not involved, determines the applicable documentation standards are not met, the Council or the SHPO/THPO, as appropriate, shall notify the agency official and specify the information needed to meet the standard. At the request of the agency official or any of the consulting parties, the Council shall review any disputes over whether documentation standards are met and provide its views to the agency official and the consulting parties.

(b) Format. The agency official may use documentation prepared to comply with other laws to fulfill the requirements of the procedures in this subpart, if that documentation meets the standards of this section.

(c) Confidentiality—

(1) Authority to withhold information. Section 304 of the act provides that the head of a Federal agency or other public official receiving grant assistance pursuant to the act, after consultation with the Secretary, shall withhold from public disclosure information about the location, character, or ownership of a historic property when disclosure may cause a significant invasion of privacy; risk harm to the historic property; or impede the use of a traditional religious site by practitioners. When the head of a Federal agency or other public official has determined that information should be withheld from the public pursuant to these criteria, the Secretary, in consultation with such Federal agency head or official, shall determine who may have access to the information for the purposes of carrying out the act.

(2) Consultation with the Council. When the information in question has been developed in the course of an agency's compliance with this part, the Secretary shall consult with the Council in reaching determinations on the withholding and release of information. The Federal agency shall provide the Council with available information, including views of the SHPO/THPO, Indian tribes and Native Hawaiian organizations, related to the confidentiality concern. The Council shall advise the Secretary and the Federal agency within 30 days of receipt of adequate documentation.

(3) Other authorities affecting confidentiality. Other Federal laws and program requirements may limit public access to information concerning an undertaking and its effects on historic properties. Where applicable, those authorities shall

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

govern public access to information developed in the section 106 process and may authorize the agency official to protect the privacy of non-governmental applicants.

(d) Finding of no historic properties affected. Documentation shall include:

(1) A description of the undertaking, specifying the Federal involvement, and its area of potential effects, including photographs, maps, drawings, as necessary;

(2) A description of the steps taken to identify historic properties, including, as appropriate, efforts to seek information pursuant to § 800.4(b); and

(3) The basis for determining that no historic properties are present or affected.

(e) Finding of no adverse effect or adverse effect. Documentation shall include:

(1) A description of the undertaking, specifying the Federal involvement, and its area of potential effects, including photographs, maps, and drawings, as necessary;

(2) A description of the steps taken to identify historic properties;

(3) A description of the affected historic properties, including information on the characteristics that qualify them for the National Register;

(4) A description of the undertaking's effects on historic properties;

(5) An explanation of why the criteria of adverse effect were found applicable or inapplicable, including any conditions or future actions to avoid, minimize or mitigate adverse effects; and

(6) Copies or summaries of any views provided by consulting parties and the public.

(f) Memorandum of agreement. When a memorandum of agreement is filed with the Council, the documentation shall include, any substantive revisions or additions to the documentation provided the Council pursuant to § 800.6(a)(1), an evaluation of any measures considered to avoid or minimize the undertaking's adverse effects and a summary of the views of consulting parties and the public.

(g) Requests for comment without a memorandum of agreement. Documentation shall include:

(1) A description and evaluation of any alternatives or mitigation measures that the agency official proposes to resolve the undertaking's adverse effects;

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

(2) A description of any reasonable alternatives or mitigation measures that were considered but not chosen, and the reasons for their rejection;

(3) Copies or summaries of any views submitted to the agency official concerning the adverse effects of the undertaking on historic properties and alternatives to reduce or avoid those effects; and

(4) Any substantive revisions or additions to the documentation provided the Council pursuant to § 800.6(a)(1).

SOURCE: 65 FR 77725, Dec. 12, 2000, unless otherwise noted.

AUTHORITY: 16 U.S.C. 470s.

Notes of Decisions (5)

Current through August 10, 2026, 91 FR 51397. Some sections may be more current. See credits for details.

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 36. Parks, Forests, and Public Property
Chapter VIII. Advisory Council on Historic Preservation
Part 800. Protection of Historic Properties (Refs & Annos)
Subpart B. The Section 106 Process

36 C.F.R. § 800.12

§ 800.12 Emergency situations.

Currentness

(a) Agency procedures. The agency official, in consultation with the appropriate SHPOs/THPOs, affected Indian tribes and Native Hawaiian organizations, and the Council, is encouraged to develop procedures for taking historic properties into account during operations which respond to a disaster or emergency declared by the President, a tribal government, or the Governor of a State or which respond to other immediate threats to life or property. If approved by the Council, the procedures shall govern the agency's historic preservation responsibilities during any disaster or emergency in lieu of §§ 800.3 through 800.6.

(b) Alternatives to agency procedures. In the event an agency official proposes an emergency undertaking as an essential and immediate response to a disaster or emergency declared by the President, a tribal government, or the Governor of a State or another immediate threat to life or property, and the agency has not developed procedures pursuant to paragraph (a) of this section, the agency official may comply with section 106 by:

(1) Following a programmatic agreement developed pursuant to § 800.14(b) that contains specific provisions for dealing with historic properties in emergency situations; or

(2) Notifying the Council, the appropriate SHPO/THPO and any Indian tribe or Native Hawaiian organization that may attach religious and cultural significance to historic properties likely to be affected prior to the undertaking and affording them an opportunity to comment within seven days of notification. If the agency official determines that circumstances do not permit seven days for comment, the agency official shall notify the Council, the SHPO/THPO and the Indian tribe or Native Hawaiian organization and invite any comments within the time available.

(c) Local governments responsible for section 106 compliance. When a local government official serves as the agency official for section 106 compliance, paragraphs (a) and (b) of this section also apply to an imminent threat to public health or safety as a result of a natural disaster or emergency declared by a local government's chief executive officer or legislative body, provided that if the Council or SHPO/THPO objects to the proposed action within seven days, the agency official shall comply with §§ 800.3 through 800.6.

(d) Applicability. This section applies only to undertakings that will be implemented within 30 days after the disaster or emergency has been formally declared by the appropriate authority. An agency may request an extension of the period of applicability from the Council prior to the expiration of the 30 days. Immediate rescue and salvage operations conducted to preserve life or property are exempt from the provisions of section 106 and this part.