**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE D.C. CIRCUIT**

PALM BEACH COUNTY, TOWN OF PALM BEACH, CITY OF WEST PALM BEACH,

Petitioners,

v.

FEDERAL AVIATION ADMINISTRATION,

Respondent.

Case Nos. 25-1282, 25-1283, 25-1034, 25-1035 (Consolidated)

**DECLARATION OF U.S. SECRET SERVICE DEPUTY DIRECTOR MATTHEW C. QUINN**

I, Matthew C. Quinn, declare as follows:

**Background**

1. I am the Deputy Director of the United States Secret Service (Secret Service). Prior to my current appointment, I served as Deputy Assistant Director of the Office of Protective Operations and retired from the Secret Service after more than two decades of service. During that time, I held several leadership positions, including Special Agent in Charge of the Special Operations Division, Special Agent in Charge of the Office of Communication and Media Relations, Special Agent in Charge of Protective Operations, and Acting Special Agent in Charge of the Charlotte Field Office. I began my law enforcement career in 1998 at the Secret Service New York Field Office, conducting financial fraud investigations and serving as the primary liaison to the United Nations. I subsequently served as a supervisor in the Washington Field Office and as Assistant to the Special Agent in Charge at the James J. Rowley Training Center.

2. Following my retirement in 2021, I worked as a senior executive in the private sector, most recently as Senior Vice President at Fortem Technologies in Pleasant Grove, Utah, where I was responsible for developing and applying airspace safety and security solutions for law enforcement, military, and commercial stakeholders. On May 19, 2025, I returned to the Secret Service, becoming the agency's 24th Deputy Director.
3. I am a graduate of Arizona State University and hold a master's degree from the National Defense University at the Dwight D. Eisenhower School for National Security and Resource Strategy. I am also a graduate of the Key Executive Leadership Program at American University in Washington, D.C. I am a certified and appointed member of the federal Senior Executive Service.
4. The U.S. Secret Service is charged with ensuring the safety of the nation's highest-ranking officials, including the President and the Vice President. As part of that mission, the Secret Service also protects key locations where the nation's highest-ranking elected leaders live and work, as well as the foreign diplomatic missions located in and around Washington, D.C. Among these locations of national importance is the President's residence at the Mar-a-Lago Club in Palm Beach, Florida.
5. In my capacity as Deputy Director, I oversee the Secret Service's protective and investigative operations, including the directorates and offices responsible for the protection of the President and Vice President, as well as the security of the White House Complex and the President's residence in Palm Beach, Florida. As a result, I possess current knowledge regarding the status, scope, and operational security considerations related to threats to Secret Service protected persons and sites. I submit this declaration

to explain the disruptive consequences and security risks that would result if the Court vacates the temporary flight restrictions over Mar-a-Lago.

**Threat Landscape**

6. Today's threat environment is heightened, real, and dynamic. Acts of violence against the President and protected sites are occurring at an ever-increasing pace. In fact, threats against Secret Service protectees are up about 40% compared to this time last year. These individuals are not merely making verbal threats; they are taking concrete steps to carry them out. In 2026 alone, there were several high-profile protective incidents directed toward the President or the White House Complex: on May 23, an individual fired shots within yards of the White House Complex; on May 4, an individual shot at Secret Service Agents near the Holocaust Museum in Washington, D.C.; on April 25, a gunman opened fire at a Secret Service checkpoint at the White House Correspondents' Association Dinner at the Washington Hilton Hotel in Washington, D.C. In February 2026, a man approached the secure perimeter at Mar-a-Lago with a gas can and a shotgun; the man was shot and killed after he raised the shotgun in the direction of Secret Service officers and a Palm Beach County sheriff's deputy.

7. But this is not the only year in which high-profile threat incidents have occurred against this administration. On September 15, 2024, an individual was seen aiming a rifle on the golf course at the Trump International Golf Club in West Palm Beach, Florida. He was eventually found guilty of attempting to assassinate a presidential candidate, among other felonies. And, of course, on July 13, 2024, an individual fired several shots at then-Candidate Trump in an attempt to assassinate him.

8. In addition to these demonstrated threats against President Trump, the ongoing Iran conflict has significantly heightened the threat environment in the United States. As noted in news reports and the June 22, 2025, Department of Homeland Security National Terrorism Advisory System Bulletin, Iran has a long-standing commitment to target U.S. Government Officials. Iranian leadership have also publicly affirmed their posture of "Death to America" as a guiding principle and explicitly called for the assassination of President Trump. Accordingly, the current geopolitical climate materially increases the security risks confronting high-level government actors.

**Flight Restriction Request**

9. On September 16, 2025, Secret Service Director Sean M. Curran sent a request to Federal Aviation Administration Administrator Bryan Bedford requesting the establishment of permanent flight restrictions at Mar-a-Lago to ensure the safety and security of the President. Director Curran wrote that "these restrictions are requested due to adverse threat intelligence and the ongoing protective mission of the [Secret Service]. Additionally, these would greatly increase the ability to mitigate the persistent risks posed by unauthorized aircraft and unmanned aircraft systems (UAS) operating in proximity to sensitive areas."

10. Administrator Bedford responded on October 10, 2025. In his letter, Administrator Bedford shared a five-step implementation plan to address the Secret Service's airspace security concerns. Most relevant to this litigation were Steps one and four: Step one of the plan was to establish temporary flight restrictions over Mar-a-Lago pursuant to 14 CFR § 99.7; step four of the plan was to complete rulemaking to implement a Prohibited Area and a Special Air Traffic Rule over Mar-a-Lago, making the restrictions permanent.

11. The airborne threat vector at Mar-a-Lago is persistent and substantial. As the location of a primary residence of the President, from which he frequently conducts the business of the government's highest office, that threat vector must be mitigated to the extent possible whether he is in residence or not. Since October 2025, the Secret Service's Aviation and Airspace Security Division has conducted 17 deployments in support of Mar-a-Lago visits, during which there have been 57 manned aircraft violations of temporary flight restrictions (TFR), including one within 10 nautical miles, requiring Department of War assets to be committed 40 times. Unmanned aircraft systems (UAS) present an even broader challenge: reporting since October 2025 reflects 111 total counter-UAS violations of TFR with 17 drones interdicted and 46 pilots located. Total UAS detection data within the area of Mar-a-Lago exceeded more than 3,800 UAS flights of 976 unique drone IDs. These figures demonstrate that unauthorized or unidentified airborne activity near Mar-a-Lago is not hypothetical or isolated, but recurring across both manned and unmanned platforms. The frequency, variety, and persistence of these incursions materially complicate the Secret Service's ability to distinguish benign activity from hostile surveillance or attack planning and underscore the operational need for continued flight restrictions.

12. Removing the temporary flight restrictions before the Federal Aviation Administration can implement Prohibited Area over Mar-a-Lago would undermine the Secret Service's statutory mission to protect the President, the Vice President, their immediate families, visiting heads of foreign states or foreign governments, and other distinguished visitors.

13. Congress and the judiciary have long recognized that the protection of the President's residence and immediate family is paramount. *See, e.g.*, *Stigile v. Clinton*, 110 F.3d 801,

803 (D.C. Cir. 1997) (recognizing that protection of the President is of "utmost importance"); 18 U.S.C. § 3056(a) (outlining protection of the President and others as a core mission of the Secret Service). Unique national security interests are at stake, as violence against our top government officials can quickly destabilize the nation.

14. To the Secret Service, the term "protection" means both physical protection and protection against unauthorized surveillance. Unmanned aircraft systems, commonly known as drones, provide a persistent threat to the physical security of protectees and offer adversaries the opportunity to conduct unauthorized surveillance, whether the President is in his residence or not. The current flight restrictions also provide critical awareness to the Secret Service for threats posed by manned aircraft, including commercial flights, by affording time and distance to better assess the intent of and appropriately respond to any commercial airline that breaks the security threshold. The current scope of the flight restrictions, inclusive of manned commercial aircraft, also enhances the ability of the Secret Service to focus on the volume of drone threats identified above in paragraph 11. Removing the temporary flight restrictions at Mar-a-Lago would make it more difficult for the Secret Service to identify and mitigate these threats from both manned and unmanned aircraft.

15. Closing the designated airspace to all unauthorized aircraft at all times provides a clear, consistent rule for impacted stakeholders and facilitates greater ease of implementation and enforcement. Going back to an "on-and-off" airspace closure posture while working on permanent closure may unnecessarily create confusion and compromise security. Given the totality of frequent protectee visits to Mar-a-Lago, which include national and visiting foreign leaders, along with persistent infringement of the designated airspace and

continually evolving threat vectors, the current flight restrictions provide the most logical and precise threat protection.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 30, 2026.

Matthew C. Quinn
Deputy Director
United States Secret Service